**CROWNHILL HOMES, INC., Appellant,**

v.

**CITY OF SAN ANTONIO et al., Appellees.**

No. 234.

Court of Civil Appeals of Texas.

Corpus Christi.

Aug. 8, 1968.

Rehearing Denied Oct. 3, 1968.

Lang, Cross, Ladon, Oppenheimer & Rosenberg, Paul M. Green, San Antonio, for appellant.

Niemann & Babb, Larry Neimann, Austin, amicus curiae.

Sawtelle, Goode, Troilo & Leighton, Robert Sawtelle, Sam Wolfe, City Atty., San Antonio, for appellees.

## OPINION

NYE, Justice.

Crownhill Homes, Inc., a subdivider and developer, filed suit against the City of San Antonio, the Water Works Board of Trustees, and the Board members individually (including the Mayor of the City of San Antonio), seeking a declaratory judgment as to the validity of certain regulations of the Water Works Board of Trustees and praying for a writ of mandamus requiring the Board to make certain requested on-site water main extensions in developer's subdivision without imposing the costs of the same on the developer. The trial was before the court sitting without a jury. The court entered judgment declaring the Board's regulations valid, denying the developer's application for mandamus, and denying all other additional relief requested. The developer has perfected its appeal.

For a number of years prior to 1960 the municipally owned Water Works of the City of San Antonio, through its Board of Trustees, required developers as a prerequisite to the approval of their plat for subdivisions, to pay the cost of water mains within the proposed development. Included in this cost to the developer were approach main extensions from the City's transmission water mains, and local benefit on-site mains that serve directly the lots within the subdivision. A policy of the Board provided for at least a partial refund to the developers of these expenditures, based on the amount of water used by the ultimate customers over a fixed period of time. Although the present Board's regulations

continue to permit the developer to recoup his costs for the approach main extensions (which lead from the City's main transmission lines into the subdivision) the Board determined in the early part of 1960 that it could no longer reimburse the developer for the local benefit on-site water main costs. It is the refusal of the Board to make at least some of this reimbursement to the developers, that caused the initiation of this suit.

The basic issues of law presented by this appeal are: (1) Does the San Antonio Water Works Board of Trustees have the statutory authority to determine the Board's policy of governing the extensions of on-site water mains in the implementation of the City Council's approved master water plan, and if so, does the Board exercise a governmental discretion in setting forth this regulation? (2) Is the San Antonio Water Works Board's regulation valid which requires the developers to pay the entire cost of local benefit on-site water main extensions into a new area without reimbursement, when tested by the constitutional guarantees of due process of law and equal protection under the law?

The Water Works Board of Trustees of the City of San Antonio requires subdividers and developers without exception to install at their own expense, and in effect donate to the City, local on-site water mains and the necessary appurtenances designed to provide water service to the lots within their proposed subdivision. In the absence of contract performance bond, or other assurances deemed satisfactory by the Water Board, the Board will not certify to the Planning Commission of the City of San Antonio that water service is available to the subdivision. This certification is a prerequisite to plat approval by that body. So, unless the developer follows essentially this procedure by complying with the Board's regulations and policy, he is for all practical purposes denied the right to erect improvements within the subdivision. The questioned regulation reads as follows:

"Item 3. *Extension of developer-customer/on-site mains.* The construction of water distribution and pertinent facilities for domestic, commercial and fire protection uses conforming to board-approved plans and specifications may be installed by a contractor of the developer's choice, provided a performance bond for 100% of the total contract construction cost is furnished by the contractor in favor of the board and owner * * *.

"The board shall not be obligated to permit connection of any extension to existing system facilities prior to the full completion and acceptance of the entire construction by the board. * * *"

It is this regulation that forms the basis of appellant's complaint.

The San Antonio Water Supply Company, a private corporation, was purchased by the City of San Antonio in 1925 by authority of the Legislature of the State of Texas. The Legislature directed that the management and control of the system was to be placed in the hands of the City Council of the City, or if the Council and the citizens of the City deemed advisable, in the hands of a Board of Trustees consisting of not more than five members, one of whom shall always be the Mayor of such City. Art. 1109a, Vernon's Ann.Civ.St., Acts of 39th Legislature 1925.[1] The City of San Antonio decided that its water system would be governed under the alternate authority authorized by the Legislature. Therefore, the City entered into a trust agreement and placed into the hands of its Board of Trustees, the operation of the system. This was approved by the citizens of the City in an election held for that purpose.

In the early days of the Water Works Board, and especially during the years

1. For historical background see San Antonio Independent School District v. Water Works Board of Trustees, 120 S.W.2d 861 (Tex.Civ.App.—Beaumont 1938, wr. ref.).

just prior to 1955, the water system was in poor financial condition. The Board was required to borrow cash from banks to meet operating expenses. During the later years the governing Board was forced to use and finally deleted customer deposit refunds in order to carry on its operation. At that time the Water Board's regulations specified that land developers would install approach and on-site (local benefit water mains) to serve lots within their subdivision at their expense (subject to 100% refund) from the transmission water mains made available to the subdivider by the Water Board. The regulations continued, that thereafter, if revenues from water sales within the subdivision reached a certain level, the developer could receive a refund from the Board of 100% of his approach and on-site local benefit main costs.[2] The Water Board's liability to developers for these 100% main extension refunds soon amounted to $2,000,000.00. The Board determined that it was financially unable to continue this 100% refund policy. As a result thereof, the Board in 1956 amended its regulations to restrict the potential refund to developers on on-site mains to 50%. At the same time the City Council passed a 19% increase in water rates.

Two years later the City Council of San Antonio passed an ordinance authorizing the issuance of water revenue refunding bonds. This ordinance specified in detail the Board's powers, duties, functions, organization, and specifically how its revenues would be expended. The significance here is that the priority of fund requirements from water revenue under the bond ordinance called for "the maintenance and operation fund" to have first call on all water system fund revenues; next, in priority of fund requirements was (2) "interest and the sinking fund"; following

this came (3) "the bond reserve fund"; next, (4) "the improvement and contingent fund" and finally, (5) "the surplus fund." It was undisputed that the definition of a water main extension is the "addition of capacity, the addition of mains or other facilities which add to the system's size or to its amount of service units, such as customers, meters, mains, pumps, wells or other items." It is appellees' contention that under the express terms of this ordinance, costs for extensions may be made only from the "improvement and contingency fund" and the "surplus fund". The improvements and contingency fund consists, to the extent money is available from the higher priority requirements of other funds of a sum equal to 15% of the gross revenue of the system. The record shows that since the passage of the ordinance, there has never been sufficient water revenue to satisfy the priority requirements of the first four funds. The "surplus fund" has never been established.

The bond ordinance passed in conformity with Articles 1109a, 1111 to 1118w, V.A. C.S., requires the City of San Antonio to maintain sufficient rates to pay all "maintenance, depreciation, replacement, betterment and interest [and principal] charges." It was undisputed that the term "betterment" is an improvement to the plant in service, and that this definition did not include extensions or additions to the system. The bond ordinance pledged all the revenues of the system to the bond holders' first lien, after deducting operating, maintenance, replacement and betterment charges. Appellee contends that neither the ordinance nor the statutes permit the deduction of extension charges from this pledge of revenue, and that neither the statutes nor the bond ordinance require the raising of rates sufficient to pay for on-site local benefit extensions, and that this Court

2. Off-site or approach mains were defined in the regulations as "a main which brings water service and/or circulation of water to the perimeter of a property or the projection thereof across roadways abutting said property." On-site or local benefit mains are defined in the regulations as "a main to provide service within the perimeters of a property or along abutting roadways, alleys and/or utility easements."

should not require the appellee City to do so.

The financial condition of the Water Board continued to be poor. By 1960 the Board's obligations accumulated a deficit of $3,703,396.00. During the period from 1956 to 1960 and after the Board had liquidated its 100% obligation to the developers, the Board's obligation to developers of 50% refund for on-site improvements rose to $794,000.00. The system revenues were insufficient to meet this continued liability. The Board then determined that it was not in a position to meet the financial requirements of refunding 50% of the cost of local on-site mains. The Board employed consulting engineers and made comprehensive studies of the financial picture and the future of the entire water works system. The final reports were incorporated into a general master plan for the extension of water mains in conformity with Art. 974a, V.A.C.S. The City Council of San Antonio adopted the master plan for water system improvements by ordinance after favorable recommendation by the City's Planning Commission. The master plan provided for extensions of water service to all unserved areas of the city, but did not provide for extension of local on-site mains. As a result San Antonio has a thorough, detailed and complete water service extension program. It has laid transmission mains into every area and section of the city and has adopted a master plan for the extension of mains in the future through the year 1990. It pays all of the general benefit costs of extensions, including wells, pumps, pumphouses, booster stations, valves and transmission mains. Appellees' say that in the exercise of its judgment and discretion, the City has determined that the installation of on-site local benefit mains at its whole cost is not necessary to render adequate service, and it has determined further that it shall not expend its revenues otherwise pledged to bondholders for such purpose.

The present Water Board's regulations for water system extension and service line installation were approved by the Board in November, 1959 and officially adopted on February 23, 1960. The City Council approved the regulations after a public hearing as required by Art. 974a, V.A.C.S. It is the Board's regulation of water system extensions and line service installations that are under attack by the appellant. The trial court found that the regulations were adopted pursuant to and in accordance with the City's master plan for water system improvement.

The Water Board's regulations had among its terms classification of customers in two categories (1) single customer and (2) developer-customer. The appellant falls in the latter category and the court found that developers constituted a separate and distinct class for utility regulatory purposes. The appellant admits that the regulations of the Board treated all developers alike. The entire regulation covers three and one-half pages and sets forth conditions applicable to extensions of on-site mains within a subdivision. Nowhere in the regulations do they make provisions for a refund to the developer-customer for installation of the cost of on-site mains that are purely of local benefit within the subdivision, although the developer-customer may recover 100% of his cost of installation of the approach main to the subdivision. The trial court found that the foregoing regulations established clearly defined standards which apprised the appellants of their rights, duties and obligations thereunder.

Following the adoption of the regulations by the City Council, the City in 1961 raised the water rates 18%. The City Council specially conditioned approval of the increase on the premise that no water revenues would be used to refund developers the cost of on-site local benefit mains within their subdivisions. The 100% refund of the approach mains were not affected. The financial picture of the Board improved. Beginning in 1962 the Board was able to meet its 100% refund obligation to the developer-customer on the approach mains to the subdivision.

During the next few years the Board concluded that it did not have sufficient funds to carry out its master plan for extensions, its capital improvement program covered by the bond issues, the 100% refund policy on approach mains, and at the same time pay the cost for the on-site local benefit extensions (the type demanded by the appellant). The Board had committed its total revenue available for extensions pursuant to the master plan and even so the present revenues were insufficient to support the Board's five-year extension and capital improvement program which was a part of the City's master plan adopted by the City Council. The record shows that the financial condition of the Water Board indicates that there are $20,000,000.00 in revenue bonds outstanding. All revenues are pledged to the payment of these bonds except revenues exempt by statute from the bondholder's first lien. The $6,000,000.00 extension in capital improvement program, adopted in accordance with the master plan and present regulations, were designed to carry out the Water Board's whole cost, the provision of the master plan for extensions of the system to all areas of the city, including all new subdivisions. It does not include on-site local benefit mains within the new subdivision. The evidence is undisputed that had the Board pursued the policy of 100% refund of on-site main extensions during the period from 1958 through 1964 the Board would have accumulated a deficit of $4,896,643.00 by the end of 1964.

Appellee points out that the evidence overwhelmingly supports the reasonableness of the present regulations which the appellees say were adopted only after and in pursuit of an exact and exhaustive professional study of the various factors considered in a test of reasonableness. The city argues that the justification for the approach adopted by the present Water Works Board through its regulations is that the new customer, being a purchaser of a lot from the developer, pays his own way without discriminating against existing customers. The evidence shows that revenues obtained from new customers will not amortize the cost of on-site extensions to these customers. In this connection the appellees state that the City of San Antonio's medium income of families is low; that over 25% of the families have less than $3,000.00 per year income; that the overall water rates have increased 70% between 1950 and 1961; that to pay for the cost of these on-site water mains would primarily benefit the developers who admit that they pass the cost of such development on to the lot purchaser, but do not pass on to such customer any refund received by them under any refund policy such as the City Water Board has had in prior years. Appellees further argue that their approach through present regulations provides full and equal treatment to persons similarly situated and that reasonable water rates are the legitimate and commendable concern of the Water Board. Under these regulations over 7900 subdivision lots have been developed by the developer-customer and water furnished by the Board.

The appellant, as a subdivider and developer, affected by these regulations commenced what he categorizes as this "test case". The litigation began after the appellant had obtained a preliminary plat approval for Crownhill Park Unit No. 8. The appellant then demanded that the Board pay and install the on-site mains and appurtenances to three particular lots in his subdivision. The Board refused, whereupon, this suit was commenced, seeking a declaratory judgment as to the validity of the regulations in question, and praying for a writ of mandamus requiring the Water Works Board to furnish the three main extensions at the Board's cost.

The City argues that it has no obligation to extend one single main for the benefit of one single individual, a group of individuals or developers. It admits that it does have a duty to make water service reasonably available to its citizens, but the performance of this duty must be tested

in the light of its statutory powers for planning, financing and regulating.

The City of San Antonio furnishes all the backup facilities, the transmission mains and refunds 100% of the cost of the approach main. Therefore, the appellant's only complaint goes to that part of the regulations that pertains to on-site mains. The appellant has developed at least eight units of Crownhill Park comprising approximately 200 lots, some of which were developed under the old regulations permitting a 50% refund, on on-site mains and the balance under present regulations. The only exception is the three lots in question, comprising the "test case" here involved. The appellant plead that the City was obliged to make on-site water main extensions where the same were reasonable, and that its definition for the test of reasonableness is "whether the economic rate to be anticipated by the utility in extending its service to reach new customers will be sufficient to recoup over a period of time the investment of the capital improvements necessary to reach these new customers." The majority of the evidence contained in the statement of facts goes to the *proof of "reasonableness"* in regard to the request for the extension of on-site or local benefit mains and appurtenances under present circumstances. The trial court found as a fact that neither the anticipated revenue from all 39 lots in Unit No. 8 of Crownhill Park, nor the anticipated revenue from the three lots in question without an adjacent on-site main furnished by developer in Unit 8, would ever be sufficient to amortize the cost of extending water service to either of the lots in Unit 8 or to the three lots in the unit. The undisputed evidence shows that the anticipated revenue from all lots in the new subdivisions developed under the present regulations will not amortize the whole cost of extending water service to these lots, where the city utility furnishes the on-site local benefit mains, even during double the life of the facilities. The court in effect held that the subdividers' request was not reasonable.

In this respect the court found that: (1) the cost of on-site or local benefit mains is only a part of the whole cost of extending water service to any lot and that (2) the total cost of extension of water service to any lot to the Water Board includes also the cost of what is referred to as "back-up facilities" which is defined as "wells, pumps, pump houses, chlorinating equipment, reservoirs, tanks, transmission mains, telemetering and control equipment and appurtenances."

The evidence is that over one half of the cost of getting water to a new subdivision is in the "back-up facilities." Therefore the city contends that the regulations requiring the developer to pay the cost of empty on-site mains in his subdivision is a reasonable regulation as a matter of law. The subdivider pays only the on-site main that benefits the new subdivision.

The appellant in its original brief presents 24 points of error, none of which challenge the sufficiency of the evidence to support the findings of the trial court, and almost all of which complain of the trial court's conclusions of law. The appellees answer these points in seven counterpoints. Three of these are briefed and argued together and one concerns the results of the trial court's judgment. In general, appellant contends that the regulations in question are invalid; that the City of San Antonio has the obligation to make all extensions of on-site mains at its expense, that are proved to be reasonable extensions. In this connection appellant argues that the regulations should contain criteria of reasonableness to which all developers could turn for guidance in the presentation of their extension requests to the City for consideration, a criteria which could and would afford a basis for judicial review of the City's decision in the event such request was denied. In support of these contentions the appellant argues that the city-owned water utility is governed by the same legal duties as that of a privately owned utility, although some procedures might be different; that the purpose and

the effect of the City's regulations are to shift the capital costs of the extensions from the city-owned utility to the developer; that this policy is invalid as requiring the developer to make a gift of its water mains to the city-owned utility without reimbursement; that the classification of the developers, deprives them of due process and equal protection of the law; and finally, that a city utility acting through its agents (Water Works Board of Trustees) does not prescribe rules and regulations for the operation of the water system in a governmental or legislative capacity, but prescribes them as a proprietary function.

The City of San Antonio is a home rule city. It purchased the water works system under the authority given it by the Legislature, Art. 1109a, V.A.C.S. The statute provides in part that this law shall be cumulative of all legislative acts granting the power to all cities including home rule cities, and it is not intended to limit or impair any power given by any other of such acts. (Sec. 7.). Appellees contend in addition to this Art. 1109a, other articles give it its governmental power and authority in enacting the questioned regulations. They are: Articles 974a, 1108, 1110c, 1111, 1113, 1113a, 1115, 1116, 1118, 1118a, and 1175, V.A.C.S.

In 1957 an ordinance was passed by the City of San Antonio which made important changes in the operation of the water works system. The Water Works Board of Trustees under this ordinance for instance, were to be named by the City Council and vacancies were to be filled by it. The Board was given absolute and complete control and power with reference to the control, management and operation of the system. The Board was charged with the duty of making recommendations to the Council concerning the fixing of rates and charges, but that the power of fixing rates and charges for services rendered by the system was left in the City Council.

The trial court ruled among other things that the Water Works Board of Trustees of the City of San Antonio, had full power and authority in the making of rules and regulations governing the furnishing of water service; and that in reference to the making of extensions, the regulations in question were reasonable, lawful and were a legal exercise of the Board's legislative discretion and governmental powers. The Court further ruled that the Board prescribed these regulations in a governmental capacity although it owns and operates the municipal water system in a proprietary capacity.

The power of the City of San Antonio which operates under the home rule amendment, is limited only by the provisions of the Federal and State Constitutions and the general state laws. Denman v. Quin, 116 S.W.2d 783 (Tex.Civ.App.—San Antonio, 1938, err. ref.); Constitution of the State of Texas, Vernon's Ann.St. Constitution, Art. 11, Sec. 5. The city is vested with two kinds of powers and functions, governmental and proprietary.

"* * * Governmental functions are exercised in the administration of the affairs which affect the public generally, and are performed by virtue of powers conferred upon the city as an agency of the state. Proprietary functions pertain to business affairs administered for the special benefit of the urban community embraced within the corporate boundaries. * * *"

San Antonio Independent School District v. Water Works Board of Trustees, 120 S.W. 2d 861 (Tex.Civ.App.—Beaumont, 1938, wr. ref.), see cases cited therein; 39 Tex. Jur.2d, Sec. 307, pp. 636–637.

Generally, a private water utility is required to make the extensions directed by its franchise, the granting and terms of which are an exercise of governmental discretion by the governing body of the municipality, or by any applicable common law duty which has not been abrogated by the franchise or statute. The appellant admits that a city such as San Antonio

has governmental power to regulate and prescribe extension policies where it concerns a privately-owned public utility, but here argues that a municipality cannot, in its governmental capacity, set its own extension regulations, because such policy making operation by the city of its municipally-owned utility, is proprietary in nature. Appellees on the other hand reason, and we agree, that the statutes that make municipalities, regulatory bodies over privately owned public utilities with governmental power and discretion, cannot be deemed to deny the municipality the exercise of that same power in its own behalf. Citing Art. 1175, V.A.C.S. which says in part: (Para. 11 to the effect) that cities adopting the home rule amendment may:

> " * * * have the exclusive right to own, erect, maintain and operate water works and water works system for the use of any city, and its inhabitants, to regulate the same and have power to prescribe rates for water furnished * * * and to do and perform whatsoever may be necessary to operate and maintain the said water works or water works system * * *."

In Art. 974a, Sec. 4, the Legislature provided in part:

> "If such plan or plat * * * shall conform to the general plan of said city and its * * * public utility facilities * * and to the general plan for the extension of such city * * * regard being had for access to and extension of sewer and water mains * * * and if same shall conform to such general rules and regulations, * * * governing * * * subdivisions of land * * * as the governing body of such city may adopt and promulgate to promote the health, safety, morals or general welfare of the community, and the safe, orderly and healthful development of said community (which general rules and regulations for said purposes such cities are hereby authorized to adopt and promulgate after public hearing thereon), * * *." (Emphasis supplied).

To the same effect is the utility and bond statutes which bear out the governmental nature of the power to prescribe regulations for extensions. See Arts. 1108; 1109a; 1115; 1116; 1118a, sec. 5, V.A.C.S.

Art. 1109a, Sec. 4, provides that the city shall have the power to own, extend and enlarge its water systems and to manage and control the system through the city governing body or its agent by designation in a contract for such purpose.

> " * * * in all matters where such contract is silent, the laws and rules governing the council of such city shall govern said board of trustees so far as applicable. Said city council or *board of trustees* having such management and control *shall have power to make rules and regulations governing the furnishing of service to patrons* and for the payment for same, * * *." (emphasis supplied).

The Supreme Court of Texas has said that where a city which was statutorily empowered to provide a city with water, the exercise of such express power granted to a city, is within its discretion and partakes of a legislative nature. "The courts will not regulate the exercise of such a power unless it is exercised in a manner clearly abuse thereof. * * *" citing authority. The Court went on to say in effect that this policy making function of a city is governmental in nature. In agreeing with the holding of the Court of Civil Appeals concerning the matter in which the City of Haskell exercised this express power to provide a suitable water supply, the Supreme Court said (this express power) * * *

> " * * * rests largely in the discretion of its governing body, and that the City possesses the implied power to oppose the implementation of a project which its governing body, in the exercise of reasonable discretion, considers to be detrimental to the present or future water supply which the City is required by statute to provide for its inhabitants. * * *"

Kimbrough v. Walling, 371 S.W.2d 691, Sup.Ct.1963.

Concerning the power of a municipality in exercising and prescribing rules and regulations the court in City of Wink, et al v. Wink Gas Co., 115 S.W.2d 973, wr. ref. (Tex.Civ.App.—El Paso, 1938) stated that the city has the power to regulate by ordinance the rates to be charged by gas companies and other public utilities. Citing Art. 1119, V.A.C.S. which the Court says describes the governmental power in part:

> " 'and *also to prescribe rules and regulations* under *which such commodity shall be furnished*, and service rendered, and to fix penalties to enforce such charges, rules and regulations.' *The power of the city to regulate rates to be charged by public utilities and to prescribe rules and regulations under which such commodities shall be furnished is governmental.* * * *"* (emphasis supplied)

The language of statutes that delegate regulatory powers to home rule cities and operating boards, are also consistent in their grant of governmental power. Arts. 1108 and 1175, V.A.C.S. See City of Beaumont v. Calder Place Corporation, 143 Tex. 244, 183 S.W.2d 713 (1944) which recognizes the power of home rule cities to maintain and operate the water works system.

The trial court ruled that the right of the governing board to determine the area to be served and extensions to be made by the water utility was a matter within its sound discretion. Citing Art. 1116, V.A.C.S. In this connection the trial court ruled that the determination of how much revenues of the water system should be applied to the extensions of the system was also within the sound discretion of the governing body. Citing Arts. 1113 and 1113a, V.A.C.S. The trial court further ruled that the bondholders have an irrevocable first lien on all revenues of the system except the revenues used for certain expenditures that are exempt by statute. Expenditures for extensions are not exempt, except those which in the Board's judgment, are necessary to keep the plant in operation and to render adequate service. The appellant argues that the Legislature evisioned that the municipally owned water system should make all extensions at its expense and provide the means to finance such extensions. In this connection the appellant would have this Court, in effect, order the City to raise its water rates or provide bond money to pay for the costs of all such extensions. The undisputed evidence shows that there is insufficient revenue to pay for all on-site local benefit extensions without the sale of revenue bonds or a rate increase.

▮ Appellant does not cite any Texas authority for the proposition that the determination by a city-owned water utility as to what extensions shall be made is not a matter for the sound discretion of the governing body. Even appellant's out of state authority which it relies on so heavily, is distinguishable by the facts in each case. The majority rule, however, which we believe governs this case is set forth in the text of American Jurisprudence and American Law Reports wherein it is said that:

> "* * * a municipality which engages in furnishing water to its inhabitants is generally regarded as having a governmental discretion as to the limits to which it is advisable to extend its mains, and an extension will not be compelled by the courts at the instance of an inhabitant. * * *"

56 Am.Jur., Sec. 61, p. 966. Again the majority rule is stated in the American Law Reports as:

> "Although there exists, of course, a basic underlying obligation of a city owning a general domestic water system to supply impartially all applicants in substantially like position to those being served, it has quite generally been held or recognized that a municipality exercises a discretionary function in deciding whether or not to extend its system to an entirely new section within its territorial limits, and cannot be compelled to do so at the

instance of a prospective consumer, at least if its basis for refusing is in any way reasonable and does not, therefore, involve any abuse of discretion, or arbitrary or fraudulent action * * *."

Citing various jurisdictions which uphold this general rule. 47 A.L.R.2d 1222 at 1225. See also 94 C.J.S., Waters § 278 at page 139; 63 C.J.S., Mun.Corp. § 1051, pp. 698–672.

To hold that the regulations complained of by the appellant are invalid and to grant the mandamus requested by the appellant subdivider, would in our opinion be, a substitution of this Court's judgment for the legislative discretion given to the municipal governing body. The Texas courts have uniformly refrained from so doing. Justice Steakley in a unanimous opinion by the Supreme Court, speaking of this expressed statutory power of a city to provide its inhabitants with water, said that a city was acting within its discretion and such power partakes of a legislative nature and that " * * * The courts will not regulate the exercise of such a power unless it is exercised in a manner clearly abusive thereof." Kimbrough v. Walling, supra. See also Chemical Bank & Trust Co. v. Falkner, 369 S.W.2d 427 (Tex.Sup.1963); Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475 (Tex.Sup.1934).

■ There is no Texas case on all fours on the question of the discretionary authority of the municipality to extend on-site water mains under similar facts. However, there is very persuasive Texas authority which indicates to us that the promulgation of policies concerning water main extensions by the governing body of the municipality, is an exercise of a governmental function. In the case of Crouch v. City of McKinney, 47 Tex.Civ.App. 54, 104 S.W. 518 (1907, wr. ref.) the Court in upholding the action of the trial court in refusing a mandatory injunction said that:

"The government of the city has been intrusted to a mayor and board of aldermen, and, so long as the affairs of the city are conducted in a reasonably judicial manner, their acts will not be interfered with. * * * *"

The Court went on to say that the duty of the city to extend water lines is a matter which should be left to the sound discretion of the City Council.

Again, in a very recent case where a developer of a subdivision sought a mandatory injunction to require the city to extend certain water lines within the subdivision and to have the court hold void an ordinance of the city, the Court, in refusing the injunctive relief, said:

"The court properly refused to require the City to extend the water line now existing in the Bassridge Addition, although the city has the responsibility to furnish water to the inhabitants of the City. *This service is subject to reasonable regulations promulgated by the City.* The Charter does not require the City to furnish all *extensions* of water mains desired by a property owner, but only to furnish such facilities with reasonable diligence." Citing Crouch v. City of McKinney. (emphasis supplied)

City of Snyder v. Bass, 360 S.W.2d 426 (Tex.Civ.App.—Eastland 1962, wr. ref. n. r. e.). The Court in City of Snyder case went on to say that in reference to the Crouch case, that the duty of a city to extend water lines was a matter that should be left to the sound discretion of the City Council. The Court cited with approval the annotation contained in 48 A.L.R.2d 1224 that:

" * * * the majority rule is that a city in such cases has the right to exercise its discretion in a reasonable manner. * * * *"

The appellant relies most heavily on three New Jersey cases. However, a close reading of these cases shows that the New Jersey courts also recognize the general rule that "a municipality that engages in furnishing water to its inhabitants has a governmental discretion as to the limits that

are advisable to extend its mains." The New Jersey courts, however, likened the municipally owned utilities to that of a privately owned utility. These cases are persuasive in a way, to appellant's contentions, however, they all can be distinguished and the results obtained do not follow the majority rule or the trend in the Texas courts. For instance, there is no showing whatsoever that the New Jersey statutes on the subject of extension, contain in any way, the discretionary language contained in the Texas statutes.[3]

In 38 Am.Jur., Section 560, p. 248, the general rule is again said to be that:

"* * * the furnishing of public services, rests in the discretion of the governing municipal authorities, * * * and the courts will not undertake to control or interfere with the exercise of such discretion in the absence of bad faith or abuse. * * *"

See Browne v. City of Bentonville, 94 Ark. 80, 126 S.W. 93 (1910); Middletown Water District v. Tucker, 284 S.W.2d 666 (Ky. 1955); City of Greenwood v. Provine, 143 Miss. 42, 108 So. 284, 45 A.L.R. 824 (1926); Commonwealth ex rel Green v. Alexandria Water Co., 192 Va. 512, 65 S.E.2d 521 (1951); City of Bellaire v. Lamkin, 159 Tex. 141, 317 S.W.2d 43, 66 A.L.R.2d 1289 (1958); Forbes v. City of Houston, 356 S.W.2d 709 (Tex.Civ.App.—Houston 1962, wr. ref. n. r. e.). Here the Texas Court said in order for an action of the City Council to be subject to mandamus the act must be a ministerial act or, if discretionary, there must be a clear case of abuse of discretion. See also Jarrett v. City of Boston, 209 Ga. 530, 74 S.E.2d 549, 40 A.L.R.2d 1327 (1953); Reed et al v. City of Langdon, 78 N.D. 991, 54 N.W.2d 148 (1952). In a very recent opinion by the Supreme Court of Texas, Texas Power & Light Co. v. City of Garland, Tex., 431 S.W.2d 511, our High Court recognizes the governmental power of the city in enacting regulations. Although it concerns the police power of the city the Supreme Court recognizes the governmental function of the municipality where rules and regulations are concerned.

The trial court ruled that the appellant failed to meet its burden of proof to show that the regulations or order reaffirming the regulations were arbitrary, capricious or unreasonable. Sifford v. Waterworks Board of Trustees, 70 S.W.2d 476 (Tex.Civ.App.—San Antonio 1934, wr. ref.). We hold that the order and regulations of the Water Works Board of Trustees was reasonable when tested by substantial evidence. We further hold, therefore, that the Board in promulgating its water main extension regulations, exercised its legislative or governmental power, and did not act in a proprietary capacity. Crouch et al v. City of McKinney; City of Snyder v. Bass, supra; Rounds v. Board of Water and Sewer Commissioners, 347 Mass. 40, 196 N.E.2d 209 (1964) and cases cited therein. See Filger v. Public Water Supply Dist. No. 1 of Clay Co., 346 S.W.2d 567 (Mo.App.1961) where the Court approved an instruction as a fair and proper declaration of the law to-wit:

"* * * that the Board of Directors (water supply district) does not have an absolute duty to serve all inhabitants of the District with the amount of water such applicant may request, but, *in the exercise of their discretion as such Directors,* may refuse to furnish water to an applicant in the quantity requested provided, however, *such decision is not arbitrarily arrived at as a result of fraud or caprice or in an effort to discriminate against any particular applicant.*" (emphasis supplied).

See also Town of Wickenburg v. Sabin, 68 Ariz. 75, 200 P.2d 342 (1948); Johnson v.

---

3. See Reid Development Corp. v. Parsippany-Troy Hills Township, 10 N.J. 229, 89 A.2d 667 (1952); Reid Development Corp. v. Parsippany-Troy Hills Township, 31 N.J.Super. 459, 107 A.2d 20 (1954); Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, 28 N.J. 423, 147 A.2d 28 (1958).

Reasor, 392 S.W.2d 54 (Ky.1965); Wolff v. Louisville Water Co., Inc., 302 S.W.2d 104 (Ky.1957).

The questions of whether appellees' regulations are constitutional, whether appellees exercise a governmental discretion in making water main extensions and the other issues presented by this appeal, cannot be resolved by comparing the number of cities that make refunds of water main extension costs to developers with the number of cities which do not make such refunds. The trial court did not rule that there was only one reasonable method that the Board could have adopted.

The policy of determining who will pay the cost of water extensions in subdivisions is closely related to the rate making policy of the city. Appellant would in effect have our courts require the municipality either to raise the water rates, or issue revenue bonds as an alternative to the present regulations. If appellant is correct, the right to determine water rates would then be divested out of the governing body of the City and ultimately determined instead by the developers' judgment, or the City's judgment as to how many water customers can be generated by the sale of houses and what rates would have to be charged to pay for the new subdivision's on-site extensions. But it is not a municipal function to speculate in concert with developers in the subdivision business. The Legislative expressly excluded extensions in establishing the factors for rate charges necessary to retire revenue bonds. If we agreed with appellant, and if extensions were now included as a factor in rate making, the court's mandate would in effect be a substitution of its judgment for the judgment of the Legislature and local governing body. This would be an incorrect court function.

■ Appellant complains of the constitutionality of the regulations which require the developer to donate the on-site water mains to the city, and the refusal of the Water Works Board to reimburse the developer for this expenditure. The authorities hold that the municipality has the right to impose conditions on subdivision development, including the "donation" of streets, alleys, drains, water mains, sewer mains and the like. See Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475 (1934) and the many cases cited in Shepard Texas Citations following this authority. The overwhelming weight of authority is that such donation is not a taking of appellant's property for public use without reimbursement. The exercise of governmental discretion to impose reasonable regulations as a condition for the use of property, or as a condition precedent to the subdivision of land, does not amount to a taking of private property for public use without just compensation.

■ Article 974a, V.A.C.S., for instance, requires an owner to dedicate land for streets, alleys, parks, playgrounds and public utility facilities as a condition of plat approval. A number of cases from other states recognize the rule that requires the subdivider to agree in advance to vest title to water mains in the city without compensation as a condition to receiving water. See Zastrow v. Village of Brown Deer, 9 Wis.2d 100, 100 N.W.2d 359 (1960); Rounds v. Board of Water and Sewer Commissioners, 347 Mass. 40, 196 N.E.2d 209; Blevens v. City of Manchester, 103 N.H. 284, 170 A.2d 121; Spaugh v. City of Winston-Salem, 234 N.C. 708, 68 S.E.2d 838 (1952). The Board's regulations in question require that the developers' water main facilities for domestic, commercial and fire protection use, must conform to the Board's specifications. This is not a taking of private property for public use without compensation. The fire protection aspect of the regulations certainly is an exercise of the police power of the City, and to permit the subdivider in effect to dictate to the municipality its demand for extensions, we believe, would seriously take from the City its full control and supervision of the water system, and would interfere with the exercise of this part of its police power. City

of Beaumont v. Calder Place Corp., 143 Tex. 244, 183 S.W.2d 713 (Tex.Sup.1944); Moser et al v. Greenland Hills Realty Co., 300 S.W. 177 (Tex.Civ.App.—Dallas 1927, err. ref.); see also Texas Power & Light Co. v. City of Garland, Sup.Ct., supra.

The water mains in question are constructed for the benefit ultimately of the potential lot owner, not the subdivider who bought the raw land and transformed it into a residential lot. It has been held that there is an implied dedication of such water main to the lot owners, the water consumer, and the public generally for this purpose. By virtue of such implied dedication the municipality may use the mains to supply water to the lot owners and to connect with its fire protection facilities without compensation to the subdivider. City of Danville v. Forest Hills Development Corporation, 165 Va. 425, 182 S.E. 548 (1935); Hightower v. City of Tyler, 134 S.W.2d 404 (Tex.Civ.App.—El Paso 1939); City of Houston v. Lakewood Estates, Inc., 381 S.W.2d 697 (Tex.Civ.App.—Houston 1964). The United States Court of Appeals in upholding a trial court's refusal of a recovery by the developer stated:

"The water systems were installed for the purpose of making the lots within the subdivision salable and usable for residential purposes. Their intended purpose from the outset was to serve the purchasers of lots, the consumers of water, and the public. * * * [t]he action of the city and county in taking charge and control of such systems for use in furthering the public purpose to which they were dedicated did not constitute the wrongful taking or appropriation of property of plaintiffs which rendered the city and county liable in damages for conversion. * * * "

Trentman v. City and County of Denver, Colorado, 129 F.Supp. 624; 10 Cir., 236 F.2d 951.

Finally, appellant argues that it has been denied substantive due process and equal protection of the law in violation of the state and federal constitutions. In the case of Johnson v. Benbrook Water and Sewer Authority, 410 S.W.2d 644 (Tex. Civ.App.—Ft. Worth 1966, n. r. e.), cert. den. 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 106, the defendant Water & Sewer Authority adopted a policy of requiring all builders, subdividers and developers to pay the entire cost of extending the water and sewer system to and through any new area being developed for which the developer had requested water and sewer service. The Benbrook Authority required that the planned extensions must be approved by their engineer prior to commencement of construction. In addition to this, the Benbrook Authority required that all developers pay the entire cost of the improvements necessary to provide adequate water and sewer service to the persons residing within its boundaries. The evidence was that even with the policy of requiring that such extensions be paid by the developer without reimbursement, the Benbrook Water and Sewer Authority had steadily increased its indebtness since its creation. On appeal the plaintiff raised one question and that was whether or not the Benbrook Water and Sewer Authority has the constitutional and statutory authority to require the developer to extend the water and sewer extensions at its own expense and without reimbursement? The legal question presented was whether or not such policy of the Authority constituted an appropriation or a taking of the developers' property without due process of law and did the implementation of that policy to the developer deny to him equal protection of the law? The Court held that it did not. Citing authority. Virtually the same contention is made by appellant here.

We hold that the Board's regulation was valid which required the developers to pay the entire cost of local on-site water main extensions into a new area without reimbursement when tested by the constitution guarantees or due process of law and equal protection under the law. Appellant's points are overruled.

The judgment of the trial court is affirmed.

SHARPE, Justice (dissenting).

I respectfully dissent.

I would hold as follows: That the Water Board regulations which require a developer or new customer to convey water mains to the city-owned utility without compensation or promise of reimbursement as a condition of securing water service in the City's monopoly area are invalid and unenforceable; that the Water Board in prescribing regulations concerning "on-site" mains acts in an administrative capacity relating to a proprietary function and not in the exersice of a governmental function; that whether a proprietary or governmental function is exercised by the Board in prescribing such regulations, they are invalid and unenforceable because they refuse a customer's right to reasonable extensions of water mains, they unreasonably discriminate against developers and new customers, and they deny equal protection of the law and take property without due process of law.

In my view, appellant was entitled to declaratory judgment favorable to it determining its rights and appellees' duties concerning extensions of "on-site" mains. I would reverse and render judgment on that phase of the case and would reverse and remand in connection with appellant's application for mandamus for the reasons to be hereinafter discussed.

This case involves important questions concerning the operation of a city-owned water utility. In my view the majority opinion does not adequately give the setting of the case, nor does it fully state or discuss the contentions of the parties, particularly those of appellant. I am in disagreement with the material holdings of the majority opinion. The resulting differences will be discussed in the course of the opinion. I particularly am not in accord with the majority view, as I understand it, that

if the issues presented here should be decided favorably to appellant, this Court would be substituting its judgment for that of appellees in determining the policies applicable to the city-owned water utility. This is not at all the case. What we are called upon to do is to determine the questions concerning the legal rights of appellant and the legal duties of appellees in the light of the contentions made. If the regulations here involved are invalid and unenforceable, as I believe is the case, it is still the function and duty of appellees to determine a valid policy to be followed by them. The decision of the Court in such case does not amount to substitution of Court judgment concerning matters which are for determination of appellees in the first instance.

The record herein consists of the Transcript containing 236 pages, the Statement of Facts containing 817 pages and approximately 250 pages of exhibits. The briefs of the parties and of Amicus Curiae contain 334 pages.

The questions presented are closely related and discussion of them overlaps. In order to facilitate consideration of the decisive issues, this opinion will be divided into sections as follows: I. The setting of the case. The regulations. The basic contentions of the parties. The findings and conclusions. Historical and factual background. II. The nature of the duty owed to its customers by a city-owned water utility in its monopoly area. III. The reasonableness in fact of a request for extension of water mains. The factors of reasonableness. The refusal of the regulations to recognize reasonable extensions. IV. Whether a proprietary or governmental function is exercised by the Water Board in promulgating regulations. Police power argument. V. The discretion to be exercised. VI. The discrimination questions. Classification of developers. VII. The due process and equal protection questions. VIII. Declaratory judgment. IX. Mandamus. X. Conclusion.

## I.

### THE SETTING OF THE CASE. THE REGULATIONS. THE BASIC CONTENTIONS. THE FINDINGS & CONCLUSIONS. HISTORICAL AND FACTUAL BACKGROUND.

The case is before this Court on transfer by the Supreme Court from the San Antonio Court of Civil Appeals.

This is a suit for declaratory judgment and writ of mandamus brought by appellant challenging the validity of regulations promulgated by the Water Works Board of Trustees of the City of San Antonio, Texas, imposing costs for "on-site" water mains upon developers in general, including appellant, and particularly involves an order of appellee Board of Water Trustees denying extensions as to three lots owned by appellant. The trial court sitting without a jury rendered judgment denying the relief sought by appellant and thereafter filed original and amended findings of fact and conclusions of law.

Appellant, Crownhill Homes, Inc., a corporation engaged in the business of developing and subdividing property, was plaintiff in the court below. The defendants were (1) The City of San Antonio (2) its Water Works Board of Trustees, and (3) the five members of that Board, individually, one of whom was the mayor of San Antonio. Hereafter I will sometimes refer to appellant Crownhill Homes, Inc., as "Crownhill", the appellee City of San Antonio as "City", the governing body of the City as "City Council" and the Water Board of Trustees as "Water Board" or "Board". The importance of these terms will hereinafter be pointed out. Amicus Curiae briefs have been filed by Texas Association of Home Builders, Inc., in support of appellant's position, and by Texas City Attorney's Association, in support of appellees' position. I will sometimes refer to such organizations, respectively, as "Appellant's Amicus Curiae" and "Appellees' Amicus Curiae".

### THE REGULATIONS

The Water Board regulations in question are entitled "Regulations for Water System Extension and Service Line Installation" originally adopted on February 23, 1960 and amended effective March 12, 1962. The regulations contain sixteen items occupying the same number of pages. The particular type of water main which is directly in issue here is an "on-site" main, defined in Item 1–G of the regulations as follows:

"An on-site main means a main to provide service within the perimeter of a property or along abutting roadways, alleys and/or utility easements."

Otherwise stated, an "on-site" main is one from which a lot directly receives a water supply.

The regulations in Item 1–F also define an "approach main" as follows:

"An approach main means a main which brings water service and/or circulation of water to the perimeter of a property or the projection thereof across roadways abutting said property."

The regulations attempt to classify customers into two categories: (1) Single customer, and (2) Developer-Customer. Generally, a "Single customer" is an applicant for service on one lot or property. A "Developer-Customer" is an applicant for service for development of platted subdivisions, lots or tracts "upon which more than one residential, commercial or industrial establishment is to be erected." Item 3 of the regulations, covering 3½ pages thereof, provides in detail for extension of "on-site" mains for a "Developer-Customer". Item 4 of the regulations provide in detail for extension of "approach mains" for a "Developer-Customer". Under the regulations, a single customer or a developer must furnish the initial capital outlay for an "approach main" but is reimbursed by the Water Board under a revenue-refund arrangement over a period of seven years,

the amount of which may or may not equal 100% of the capital outlay. The arrangement as to "approach mains" is not directly in issue here. However, the regulations require that both new single customers and developers must bear the entire cost of an "on-site" main without compensation or promise of reimbursement. The regulations further, in Item 15, prohibit installation of water mains in any location other than a dedicated street, alley, public way, or utility easement running in favor of the City for the use and benefit of the Water Board. The regulations in Item 1–I further provide that service line connections shall be made only upon compliance with various requirements which include the execution of a contract for water service. The contract provides that the facilities installed by the Developer-Customer shall unconditionally become the property of the City for the use and benefit of the Water Board and contains a formal conveyance to such effect.

The regulations also provide for other charges which must be paid by every new customer, also not in issue here. These charges include a "system charge" graduated according to meter size ranging from $10.00 for a ⅝ inch meter to $75.00 for a 6 inch and larger meter; and a service line installation charge beginning at $40.00 and increasing with the sizes of the service line and minimum size main connections.

The provisions of the regulations requiring developers to bear the entire cost of "on-site" mains without compensation or promise of reimbursement and to convey them to the City and its Water Board are directly attacked by appellant for the reasons hereinafter stated.

## BASIC CONTENTIONS OF THE PARTIES

Appellant asserts 24 points of error, 18 of which complain of the conclusions of law made by the trial court holding generally that the regulations are valid and enforceable, are not discriminatory in their operation and effect, and are not violative of due process or equal protection provisions contained in the constitutions of the State of Texas and the United States of America.

Appellant's basic contentions in substance are: That the substantive legal duties owed to its customers by a city-owned water-utility within its monopoly area are the same as those owed by a privately-owned utility, although some procedures may be different; that a city-owned water utility has an obligation to make all reasonable extensions of its mains, including "on-site" mains, considering the various factors of reasonableness; that the law makes adequate provision for the city-owned utility to finance the capital costs of such reasonable extensions; that a violation of the duty of the city-owned water utility is established here, particularly because the regulations refuse to recognize that any request for an extension of an "on-site" main can be reasonable under any conditions; that the purpose and effect of the regulations is to shift capital costs from the city-owned utility to developers and new customers; that such policy and the results thereof are unauthorized, particularly where landowners, developers and new customers are required to make a gift of water mains to the city-owned utility without compensation or promise of reimbursement; that a city-owned utility, acting through its agents, does not prescribe rules and regulations for the operation of the water system in a governmental and legislative capacity, but on the other hand, prescribes them in a proprietary capacity; that developers may be classified based upon consideration of proper factors, but not for the purpose of hostile or special legislation which unreasonably discriminates against them; and that the regulations deprive appellant and developers of due process and equal protection of the law; that appellant is entitled to declaratory judgment and mandamus.

In its supplemental brief filed after submission of this case Crownhill states the

"exact nature of appellant's cause of action" to be as follows:

"Crownhill Homes is asking this Court to declare, by invalidating appellees' regulations, that the City of San Antonio has the obligation to make all *reasonable* extensions of 'on-site' mains, and appurtenances thereto, at its expense. It does not ask the City of San Antonio to pay for all such extensions, nor does it ask that it pay for all such extensions which Crownhill Homes thinks are reasonable, nor does it ask that it pay for all such extensions any other developer might think reasonable, but it only asks that the City pay for those extensions *proved to be reasonable.* A fundamental corollary of the relief sought is that the City of San Antonio should adopt regulations which contain criteria of reasonableness to which all developers may turn for guidance in presenting extensions requests for the City's consideration, and which criteria will afford a basis for judicial review of the City's decision in the event such requests are unreasonably or arbitrarily denied."

Appellant's contentions are further partly summarized in the original brief of Appellant's Amicus Curiae, in substance as follows:

"The municipal regulations which force landowners to finance, construct, and make a gift of watermain extensions to the city, are invalid as an arbitrary refusal by the city to perform its duty of making all reasonable watermain extensions."

Appellees, by seven counterpoints as here indicated, contend that the trial court correctly ruled: (1) That the City of San Antonio in prescribing regulations governing the extension of water service acts in a legislative or governmental capacity, (2) That the determination of what extensions shall be made by a municipal water system is a matter within the sound discretion of the governing body in the exercise of its legislative and governmental powers, (3)

That a city is not obligated to make all extensions but may, to the contrary, expend revenues only for extensions which in the judgment of the governing body are necessary to render adequate service, (4) That the extensions to be made and the determination of how much of the revenues of the water system should be applied to such extensions of the system is within the sound discretion of the governing body, (5) That the regulations and order in controversy are reasonable, lawful and supported by substantial evidence, (6) That appellant failed to prove that the regulations and order infringe State and Federal constitutions, (7) That appellant failed to establish grounds for mandamus. The brief of appellees' Amicus Curiae makes the following contentions: (1) The appellee acted in a legislative or governmental capacity in promulgating rules and regulations and in enacting ordinances governing the extension of water service to appellant and others similarly situated, (2) The trial court correctly held that appellant constituted a separate and distinct class for regulatory purposes and that subject ordinances, rules and regulations did not infringe the state or federal constitutions.

## THE FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial court made 31 findings of fact and 32 conclusions of law, contained in 11 pages of the Transcript. The parties have briefed the questions presented largely in terms of the conclusions. In my view, a reading of the findings and conclusions makes for a much clearer understanding of the case and a copy of them is attached as Appendix A to this opinion. Some of the conclusions are not attacked. However, a number of them are complained of by appellant as being completely wrong and some others as being partly wrong and partly right but wrong on the whole. Some remaining conclusions, which are closely related to others, are placed in question because of uncertainty in meaning. The conclusions which are not attacked, and with which I am in agreement are numbers 1,

2, 3, 4, 9, 10, 11, and 12. The conclusions which are attacked by appellant and which I have concluded are completely erroneous are numbers 17, 19, 21, 23, 25, 26, 28, 29, 30 and 32. The conclusions which are also attacked by appellant as being erroneous on the whole, but which contain more than one conclusion and which I hold are partly right and partly wrong are numbers 5 and 7. The remaining conclusions not mentioned above are numbers 6, 8, 13, 14, 15, 16, 18, 20, 22, 24, 27, and 31. Insofar as these conclusions are material, they will be considered either along with other conclusions or separately in the course of the opinion.

If I am correct in the view that various conclusions of the trial court are erroneous, the result would be that appellant's principal contentions should be sustained and the judgment reversed.

## THE HISTORICAL AND FACTUAL BACKGROUND

Before reaching a discussion of the specific contentions in connection with the findings and conclusions of the trial court, I will set out additional matters which I consider to be necessary for a better understanding of the case and the context in which the questions presented must be decided.

The case of San Antonio Independent School Dist. v. Water Works Board of Trustees, et al, 120 S.W.2d 861 (Tex.Civ. App., Beaumont, 1938, writ refused) sets out the history of the acquisition by the City of San Antonio of its municipal waterworks and the operation of it for a period of about ten years. That case held that because the City of San Antonio (as "City" is defined in the opinion) was the owner of the Water Works System, that the properties thereof were exempt from taxation under the constitution and laws of this State, notwithstanding that management and control thereof were vested in a special Waterworks Board of Trustees. Some of the facts stated by the Court and holdings made by it will now be referred to. Prior to June 1, 1925 the water system in the City of San Antonio was owned by a private corporation. On that date the City purchased the water system pursuant to an Act of the 39th Legislature enacted March 5, 1925, (Acts 1925, Chapter 33, pages 154–157), codified as article 1109a, V.A.C.S. The statute was originally applicable to cities having more than 160,000 inhabitants. At the time of the decision the statute had been re-enacted and amended by the 43rd Legislature in 1933; and provisions were added to the original act making it applicable to cities having more than 290,000 inhabitants (Sec. 7, Art. 1109a). It should be noted that after said decision, Art. 1109a was further amended in 1939 and 1953. The Beaumont Court of Civil Appeals discusses Art. 1109a and generally points out the manner in which the City of San Antonio followed its provisions in its purchase of the water system. It appears that in 1925, Revenue Bonds in the total amount of $7,000,000.00, payable serially over a period of forty years, were issued in payment for the water system. A trust indenture was entered into under which the Water Works Board of Trustees, consisting of five members, was created and provision made for its operation of the system, all of which was approved by an election of the people of San Antonio. Among other things, the Court discusses the relationship between the City of San Antonio, its city council and officers, and the Water Works Board of Trustees. The holdings of the Court as to such relationship are significant. They are in part as follows:

"* * * By vesting the management and control of the Water Works System in the Water Works Board of Trustees, the City of San Antonio did not cease to 'hold' the property within the meaning of the Constitutional exemption. On this point appellant insists that there can be no 'holding' of the Water Works property by the city when the

mayor, council and other municipal officers are denied all right of possession, management, or control of it. The contention overlooks the important fact that *the mayor, city council, and other municipal officers are not, the City of San Antonio. They are merely the agents through which the corporate functions entrusted to them by law and the city charter are exercised.* The inhabitants residing within the corporate limits, or those entitled to vote at municipal elections, are the members of the corporation and these, in connection with the territory embraced within the corporate limits, constitute the corporation. McQuillin Municipal Corporations, Vol. 1, Secs. 116 and 117, p. 286 et seq." 120 S.W.2d 865 (emphasis supplied)

With reference to the Water Works Board of Trustees and the nature of the function performed by the City and its agents, the Court said:

" * * * The members of the Water Works Board of Trustees are not constitutional officers. A municipal corporation is invested with two kinds of powers or functions, governmental and proprietary. Governmental functions are exercised in the administration of the affairs which affect the public generally, and are performed by virtue of powers conferred upon the city as an agency of the state. *Proprietary functions pertain to business affairs administered for the special benefit of the urban community embraced within the corporate boundaries.* City of Beaumont v. Fall, 116 Tex. 314, 291 S.W. 202. *The ownership and operation of public utilities belong to the latter class of powers.* Community Natural Gas Co. v. Northern Texas Utilities Co., Tex.Civ.App., 13 S.W.2d 184, and authorities cited." 120 S.W.2d 866. (emphasis supplied)

The record herein reflects that since the decision in San Antonio Independent School District v. Water Works Board of Trustees, supra, certain events have occurred which will now be noted.

On April 4, 1957 the City Council of San Antonio passed and approved Ordinance No. 24819, the caption of which reads as follows:

"Authorizing the issunce of $2,178,000.00 City of San Antonio, Texas, water revenue refunding bonds, series 1957, payable only out of revenues of the City's waterworks system, for the purpose of refunding a like amount of City of San Antonio water revenue bonds dated May 1, 1925; secured by a pledge of the net revenues from the operation of the City's waterworks system; providing for the issuance of additional parity bonds; providing for the management of the waterworks system of the city by a board of trustees, and the use and application of the revenues therefrom during the time said bonds are outstanding."

The ordinance covers twenty pages of single-space printing and contains thirty-two Sections. Many provisions of the ordinance appear to be similar to those contained in the original 1925 trust indenture, based upon the discussion of it by the Beaumont Court of Civil Appeals in San Antonio Independent School District v. Water Works Board of Trustees, supra. However, some important changes were made by the 1957 ordinance in the general arrangement for issuance of bonds and for operation of the water system. Under the 1925 trust indenture, the trustees of the Water Board were named in it and vacancies were filled by the surviving members. Under the 1957 ordinance, the trustees are named by the City Council and vacancies filled by it; a full term for a trustee being eight years. The ordinance also makes provisions for issuance of parity bonds.

In Section 27, the ordinance expressly places with the Board the "absolute and complete authority and power with reference to the control management and operation of the system" except as otherwise

specifically provided therein. It further provides that the Board "may manage and conduct the affairs of the system with the same freedom and in the same manner ordinarily employed by the Board of Directors of private corporations operating properties of a similar nature." But the ordinance also recognizes that the power of "fixing rates and charges for service rendered by the system" is in the City Council. The Board is charged with the duty of making recommendations to the City Council concerning the fixing of rates and charges, whether for an increase or reduction. Aside from the rate fixing function, the only other exceptions of any real consequence recognized by the ordinance to the complete exercise of power by the Board in management and operation of the system relate to the appointment of its members and the issuance of bonds.

The Water Board Report for 1964, in evidence herein, reflects many significant facts concerning the city-owned water utility and its operations over a period of eleven years (1954–1964 inclusive). Among other things, that report shows that a water revenue bond issue of $20,885,000.00 was approved by the people at an election held in 1956. At the end of 1964 all of the bonds authorized by the 1957 ordinance and additional parity bonds had been issued, with net balances of cash and receivables remaining of said bonds in the amount of $1,152,619.60. Revenue bonds outstanding at the end of 1964 amounted to $21,218,-000.00. Pertinent portions of the 1964 report are set out in Appendix B to this opinion.

Prior to February 1956 the Water Board had a policy which in substance was that developers installed mains at their initial expense and a refund-revenue contract was entered into providing that developers could earn up to 100% of such installation cost, dependent upon the revenue derived from the subdivision involved. In February 1956 appellees reduced the maximum amount refundable to 50% of the installation cost.

This latter policy continued until February 23, 1960 when the Regulations now under attack were promulgated and by which the Water Board adopted a policy entirely eliminating refunds concerning "on-site" mains. The policy of refunds for "approach mains" was continued.

Appellees devote over twelve pages of their original brief to a general statement of the background and history of the operation of the city-owned water system and certain events leading up to the adoption of the regulations on February 23, 1960. Among other things appellees say that at the end of 1955, the water system was in poor financial condition; that the Board did not have sufficient cash to operate the system; that it had to use customers' deposits for operating expenses; that it was required to borrow cash from Banks for operating expenses; that there was a financial crisis in 1956; that after passage of the 1957 ordinance the financial posture of the Board was still poor; that from 1956 to 1960 the cumulative deficit rose from $1,124,064.00 to $3,703,396.00; that from 1956 to 1960 the Board took steps to modernize, to determine future needs and to improve its financial position. As to developers, appellees say that from 1956 to 1960, after liquidations of 100% refund obligations, the Board's obligation on the basis of a 50% refund policy for "on-site" improvements amounted to $794,000.00. Appellees claim that by 1960 the Board was not in financial position to continue refunding 50% of the cost of "on-site" mains.

The record shows that prior to adoption of the Regulations in 1960, the Board considered that it had three alternatives in connection with its policy toward developers and new customers. Testimony in this connection was furnished at the trial below by Mr. William L. Patterson, appellees' utility expert witness. He testified in part that the cost of making an extension of water-mains to new customers included "back-up facilities" consisting of wells, pumps, reservoirs, tanks, transmission mains, and vari-

ous types of equipment; and that the cost of "on-site" mains was only a part of the total cost; that due to inflation the cost of making extensions was greater than in prior years and that the cost of serving new customers exceeds the cost of serving existing customers. He then said that there were three ways to equalize the cost differential: (1) a general increase in the rate, (2) a special rate for new customers, or (3) a contribution to capital by new customers. The Board decided to adopt the third policy, resulting in the imposition of the cost of "on-site" mains on all new customers, including developers, without compensation or promise of reimbursement. The express purpose of the 1960 Regulations was to shift capital costs of "on-site" mains to new customers and developers, and the Regulations have that effect. The new customer or developer is required to furnish the capital for "on-site" mains and convey them to the City for the use of the Board as a condition of securing water service.

Crownhill Park Subdivision, developed by appellant, is wholly within the city limits of San Antonio and has been a successful residential development since 1959. The record shows that some 200 lots have been developed or sold in it. Unit No. 8 of Crownhill Park contains 39 lots. 36 of these have a water main adjacent to them, the cost of same having been borne partially by the Water Board and partially by appellant. The request of appellant for extension of "on-site" mains to the three remaining lots at the cost of the Board is particularly related to the question of mandamus herein. The trial court found in substance that the whole cost (including back-up facilities) of extending water service to all 39 lots in Crownhill Unit No. 8 could not be amortized from anticipated revenue. However, the trial court also found that "the cost of the installation of mains and appurtenances requested by plaintiff plus the Board's cost in existing mains within the Unit can be amortized out of the revenue to be derived by the Board from servicing the thirty-nine lots therein."

The population figures for the City of San Antonio as shown by the U. S. Census for the years indicated are as follows:

| | |
|---|---|
| 1850 | 3,488 |
| 1860 | 8,235 |
| 1870 | 12,256 |
| 1880 | 20,550 |
| 1890 | 37,673 |
| 1900 | 53,321 |
| 1910 | 96,614 |
| 1920 | 161,379 |
| 1930 | 231,542 |
| 1940 | 253,854 |
| 1950 | 408,442 |
| 1960 | 587,718 |

Such facts may be judicially noted. See Texas Practice, McCormick & Ray, Evidence, Vol. 1, Sec. 203, p. 236. In addition, the above figures for the population of San Antonio were furnished to this Court on stipulation joined in by counsel for the City of San Antonio in the case of Vernon v. State of Texas, ex rel. City of San Antonio, 406 S.W.2d 236 (Tex.Civ.App., Corpus Christi, 1966, wr. ref. n. r. e.).

Pages 18 and 19 of the Water Board Report for 1964 contain financial and statistical information concerning the operation of the city-owned water utility for the eleven year period 1954–1964, inclusive. See Appendix B. Some of that information will now be briefly referred to. Total Revenue and other income increased from $3,833,550.00 in 1954 to $7,022,656.00 in 1964. The number of customers increased from 103,996 at the end of 1954 to 135,728 at the end of 1964, an average increase of 3173 customers annually. Total Revenue less operating expenses increased from $2,053,069 in 1954 to $4,171,045 in 1964. The average annual debt requirements increased from $436,244.00 in 1954 to $1,208,741.00 in 1964. Such increase is attributable to the bond issue of over 20 million dollars voted in 1956 and to the refunding of existing bonds in 1957, heretofore mentioned. The municipal equity, including reserves, in the water system rose from $13,890,064.00 in 1954 to $34,815,490.00 in 1964. The total

utility plant in service, including construction in progress and equipment-working capital fund, is listed as an asset of $63,534,-560.00 less allowances for depreciation of $14,143,130.00 leaving the amount of $49,-391,510.00, at the end of 1964.

Gross plant additions for the years 1954–1964 were as follows:

| | |
|---|---|
| 1954 | $2,686,903.00 |
| 1955 | 2,720,661.00 |
| 1956 | 1,676,573.00 |
| 1957 | 3,924,303.00 |
| 1958 | 8,762,707.00 |
| 1959 | 5,037,676.00 |
| 1960 | 4,093,047.00 |
| 1961 | 2,485,809.00 |
| 1962 | 4,350,702.00 |
| 1963 | 4,554,048.00 |
| 1964 | 4,996,017.00 |

II.

## THE NATURE OF THE DUTY OWED TO ITS CUSTOMERS BY A CITY-OWNED WATER UTILITY IN ITS MONOPOLY AREA

Appellant contends that the substantive legal duties owed by a city-owned water utility to its customer within its monopoly area are no different from those owed by a privately-owned utility.

Appellees say that such duties are different; that the same rule of reasonableness does not apply to municipal utility operation as is sometimes applied to private utility corporations; that the extension of water mains by a city-owned utility is discretionary; that there is no common law duty requiring a city-owned utility to extend its mains at its whole cost even if the cost of a particular main could be amortized by anticipated revenues; and that the exercise of valid governmental planning and regulatory powers cannot be infringed by the rule of common law duty.

Several Texas cases support appellant's contention that the basic legal duties owed to its customers by a city-owned water utility are the same as those owed by a privately-owned utility having a franchise to serve customers in a particular area. City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622 (1952); City of Galveston v. Kenner, 111 Tex. 484, 240 S.W. 894 (1922); City of Houston v. Lockwood Inv. Co., 144 S.W. 685 (Tex.Civ.App., El Paso, 1912, wr. dism.) and Town of Highland Park v. Guthrie, 269 S.W. 193 (Tex.Civ. App., Dallas, 1925, wr. ref.) These cases are not mentioned in the majority opinion, although they are the first ones cited in appellant's brief.

In the case of City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622 (1952), our Supreme Court held that a city could not discriminate against non-residents when the sole basis for the differential was that water and sewer service were being furnished beyond the city limits. It appeared in that case that the city had prior to 1948 acquired the American Water Works, a privately-owned utility corporation which had charged the same rate for service to both residents and non-residents. In 1950 the city passed an ordinance raising the rates to non-resident customers so that they would pay 1½ times the rate for water and double the rate for sewer service applicable to customers within the city limits. The Court held in part as follows:

"The common-law rule that one engaged in rendering a service affected with a public interest or, more strictly, what has come to be known as a utility service, may not discriminate in charges or service as between persons similarly situated is of such long standing and is so well recognized that it needs no citation of authority to support it. The economic nature of the enterprise which renders this type service is such that the courts have imposed upon it the duty to treat all alike unless there is some reasonable basis for a differentiation. Statutes have been enacted in almost every state making this common-law rule a statutory one. Pond, Public Utilities (4th ed. 1932) sections 270–275. Hence, the American Water Works was required to, and did,

render service to respondents at the same rate as was charged within the corporate limits of petitioner.

"It is settled in this state that the petitioner, upon the purchase by it of the property of the privately-owned utility, was subject to this same rule prohibiting unreasonable or unjustified discrimination in rates and service. City of Galveston v. Kenner, 1922, 111 Tex. 484, 240 S.W. 894; Houston v. Lockwood Investment Co., Tex.Civ.App. 1912, 144 S.W. 685, writ dis'm; Town of Highland Park v. Guthrie, Tex.Civ.App. 1925, 269 S.W. 193, writ refused. This same rule prevails in many other states. 43 Am.Jur. 684; section 172; 50 A.L.R. 126."

\* \* \* \* \* \*

" \* \* \* The real reason for the rule that, in so far as treatment of consumers is concerned, the municipally-owned utility is no different from the privately-owned utility is that the economic nature of the business has not changed; it remains a monopoly in spite of the change in ownership.

"The change from private to public ownership may, in theory at least, eliminate or lessen the profit motive, but the consumer of utility services still cannot pick and choose his supplier of water as he does his grocer. The utility consumer is thus at the mercy of the monopoly and, for this reason, utilities, regardless of the character of their ownership, should be and have been, subjected to control under the common-law rule forbidding unreasonable discrimination."

The dissenting opinion in *Wiggins,* while disagreeing with the majority on the question of discrimination as to non-resident customers, points out that the City of Texarkana owed certain duties to its own inhabitants which it did not owe to non-resident customers. In our case we are concerned only with the duties owed by the City of San Antonio to its water customers located within the city limits, wherein the city-owned water utility exercises a monopoly.

In the case of City of Galveston v. Kenner, 111 Tex. 484, 240 S.W. 894 (1922) our Supreme Court affirmed judgments of the lower courts awarding a writ of mandamus against the City of Galveston and the members of its board of commissioners compelling them to establish direct separate water service to distinct apartments in a building belonging to Dr. Kenner. A city ordinance which prohibited that type of service was held to be unreasonable and discriminatory. The Supreme Court, speaking through Chief Justice Cureton, held in part as follows:

"Upon the case made in the court below, and thus briefly stated, the trial judge concluded as a matter of law: (1) That the city of Galveston, in undertaking to furnish water to the inhabitants thereof, subjected itself to the same liabilities in its relation to them growing out of the service that a private corporation so engaged would do; (2) that one of these obligations or duties is, upon proper request, to meter the water used by tenants occupying distinct tenements or storehouses (as in the instant case), read the meters, and collect directly from the tenants; (3) that, in so far as the ordinance to which we have referred undertakes to deny this service to the inhabitants of Galveston, it is unreasonable and void.

"We concur with these conclusions of law, and the Court of Civil Appeals did not err in affirming the judgment of the trial court awarding the mandamus. Our reasons for this conclusion will now be stated.

"In so far as the consumption of water is concerned, it is immaterial, in considering the rights of the consumer, whether the supply be furnished by a municipality or a public service corporation. As a general rule, the obligations to the consumer are the same in either case. It is the duty of the organization supplying the water to supply same im-

partially to all reasonable within the reach of its pipes and mains. This service must be given without discrimination between persons similarly situated or under circumstances substantially the same. Water must be furnished to all who apply therefor, offer to pay the rates, and abide by such reasonable rules and regulations as may be made a condition for rendering the service. * * *"

In the case of City of Houston v. Lockwood Inv. Co., 144 S.W. 685 (Tex.Civ.App., El Paso, 1912, wr. dism.) the Court held that certain provisions of an ordinance of the City of Houston concerning the waterworks owned by it were unreasonable and invalid because "They, in effect, provide that unless the inhabitant of the City of Houston demanding water owns property, and if he is merely a tenant, he shall not be entitled to water." The Court held in part as follows:

"We believe there is no necessity for the citation of any specific authority as establishing the rule that public service corporations in the nature of water companies, gas companies, electric light companies, and others of like kind, being given certain extraordinary privileges and rights, and the nature and conduct of their business having a monopolistic character, are charged by law with the correlative duty of treating all of the public alike, and there is upon them an implied obligation to furnish the commodity in which they deal to each and every citizen or resident who may have need of the commodity which they sell or the service which they give."

* * * * * *

" * * * The fact that the waterworks in this instance are owned by a municipal corporation does not, in our judgment, change the rule. See Linne v. Bredes, 43 Wash. 540, 86 Pac. 858, 6 L.R.A., (N.S.) 707, 117 Am.St.Rep. 1068."

In the case of Town of Highland Park v. Guthrie, 269 S.W. 193 (Tex.Civ.App., Dallas, 1925, wr. ref.) the court held invalid certain provisions of a city ordinance which levied a fee of one dollar per lot front foot for water or sewage connection. It there appeared that Highland Park had annexed Mt. Vernon, an adjacent residential district. Shortly before the annexation, the town of Highland Park had acquired a privately-owned Water Company. The water mains of Mt. Vernon were of inferior character, of small dimensions and otherwise unsatisfactory for connection to the Highland Park Water system. Several months after the annexation, Highland Park enacted an ordinance controlling the manner in which its citizens should receive their water supply. One section read in substance as follows:

" * * * before any premises shall be connected with the same and any consumer furnished water or sewerage service from the water and sewer mains so laid by the town, there shall be collected * * * from the owner and controller of such premises or the person desiring such service, a water or sewer main installation fee at the rate of one Dollar ($1.00) per front foot of the premises to be connected with such water mains and at the rate of one dollar per front foot of the premises to be connected with such sewer main, either or both * * *"

The Court held in part as follows:

"What is such rule of law when applied to this case in which two citizens of Highland Park, one residing in the old territory of Highland Park and the other in the new territory of Mt. Vernon addition, make application to the proper municipal authorities, each to have his premises, fronting 50 feet on a municipal water main, connected with such main? It is that these two citizens must be dealt with equally and given the same service on equal terms, and that the charge for the service asked must be the same to both. McQuillin Municipal Corporations, vol. 8 (sup.) § 1697; City of Galveston et al. v. Kenner, 111 Tex. 484, 240 S.W. 894.

"Can the validity of this ordinance be sustained under this rule? Under the terms of the ordinance the citizen residing in the Mt. Vernon addition is required to pay a fee of $50 for this service that cannot be exacted from the other citizen. This is unjust discrimination, unless there are such special circumstances existing in reference to one of the applicants that would warrant the placing of the applicants in a different class in respect to the charge for such service. Are there such special circumstances in this case?"

\*    \*    \*    \*    \*    \*

" \* \* \* When the municipality purchased the waterworks it did so for the benefit of the entire town of Highland Park, and that without reference to when a given territory became, or would become, a part of such municipality. There went with this purchase the duty to supply water impartially to all reasonably within reach of the pipes and mains of the water system, without discrimination between persons similarly situated. When the Mt. Vernon addition was annexed the citizens residing therein became at once entitled to all of the rights and privileges of the other citizens of Highland Park. This rule of law was declared by section 2 of the annexation ordinance, but existed without such declaration. The emergency clause of the annexation ordinance gave as a reason for the immediate passage of such ordinance the fact that the inhabitants of the annexed territory were without fire protection. After the passage of this annexation ordinance, the town of Highland Park, in the performance of its duty to give this fire protection and to furnish to the inhabitants of the annexed territory water service, voluntarily laid a water main through this territory 6,200 feet in length. This improvement in the system, as well as the drilling of an additional well, was paid for out of the proceeds of a bond issue of $125,000. The debt thus created must be paid by all the inhabitants of the municipality, including, of course, those in Mt. Vernon addition. The case presents the condition of a municipality purchasing a waterworks plant through the means of a bond issue, laying additional mains in an annexed territory through the means of another bond issue, and then enacting an ordinance prescribing an installation fee of $1 a front foot before water connection will be allowed with the new main in the annexed territory, and exempting property along the old mains that is not connected from such charge. *This is clearly an unjust discrimination and violative of the rule of common law governing the administration of a municipal owned water system. It is also violative of article 772b of the 1911 Revised Statutes, which is the fundamental law of the municipality, and declares that rates charged for services furnished by municipal water system shall be equal and uniform. It follows that the portion of the above-quoted ordinance which levies a fee of $1 per front foot for water or sewerage connection is invalid, and that this case should be affirmed.*" (Emphasis supplied)

The holdings in *Wiggins* and the cases therein cited may be partially summarized as follows: Utility service is affected with a public interest and the economic nature of the enterprise is such that the courts have imposed upon it the duty to treat all alike unless there is some basis for a differentiation. A public utility cannot discriminate in charges or service between persons similarly situated. The economic nature of the business does not change when ownership changes from private to public. A city which acquires a privately owned utility is subject to the same common law rules prohibiting unreasonable or unjustified discrimination in rates and service. It remains a monopoly. A city undertaking to furnish water to its inhabitants subjects itself to the same service liabilities to them that a privately-owned utility would do. As a general rule the obligations to the

consumer are the same in either case. It is the duty of the utility, whether privately or publicly owned to supply water impartially to all reasonably within the reach of its mains, without discrimination between persons similarly situated. The rates charged for services shall be equal and uniform.

With reference to *Wiggins, Kenner, Lockwood* and *Guthrie,* appellees say in substance that they "have no quarrel with the holdings of these cases that neither municipally-owned or privately-owned water utilities may unreasonably discriminate in connection charges or regulations." As to *Wiggins,* appellees say there is no disagreement with the holding, but that here appellant has failed to show discrimination. As to *Kenner,* appellees say that the question there was one of connection to mains already in place and not one of extension; that again appellant has not shown discrimination. As to *Lockwood,* appellees say in substance that the holding there was that a municipal utility is subject to the same constitutional mandates as a private utility. As to *Guthrie,* appellees' position is somewhat more obscure.

It is true that in *Wiggins, Kenner, Lockwood* and *Guthrie* the ultimate decision in each case was on the basis of discrimination. However, I believe that the essential holdings which led to the final determination in those cases have not been seriously disputed or distinguished by appelles. The principles there announced or reiterated concerning the obligations and duties of a city-owned water utility are important and material to the decision of this case. Under these cases and the applicable statutes it appears that the basic duties owed by a city-owned water utility to customers in its monopoly area are the same as those of a privately-owned utility having a franchise which obligates it to serve inhabitants and customers within the city limits.

It appears that some decisions from other jurisdictions hold that when a water works system is owned and operated by a municipality some rules are different from those applied to a privately-owned water utility. Other courts apparently regard a municipally-owned utility as standing in the same position as a privately-owned utility regarding extensions of its services to customers in the area to be served. Here, the discussion of whether a city acts in a proprietary or governmental function in its policy concerning extensions overlaps other questions concerning reasonableness and its proper factors, the exercise of discretion and whether there is an abuse of it. See 56 Am.Jur., Waterworks, Section 61, page 966. I believe that the holdings of our Texas Courts heretofore and hereafter cited are in accord with the view last stated in 56 Am.Jur., Waterworks, Section 61 that a municipal corporation engaged in furnishing water to its inhabitants stands in the same position regarding extension of services as a privately-owned water utility.

## THE STATUTES

The statutory provisions, most prominently involved herein have been codified as Article 1109a, V.A.C.S., the City of San Antonio having purchased its water works shortly after its enactment. However, Section 7 of that statute provides in part that it is cumulative of other legislative acts applicable to cities and towns, including home rule cities, operating under Title 28 of the Revised Civil Statutes of 1925. The parties, particularly appellees, have placed reliance in certain respects on such other statutes. Appellant places primary reliance upon Articles 1109a and 1110c, V.A.C.S. Appellees rely primarily upon Articles 1175, 1108, 1109a, 1111, 1113, 1113a, 1115, 1116, 1118, 1118a and 974a, V.A.C.S.

Appellant contends that specific statutory authorization is a prerequisite to transferring the cost burden of extending facilities to the consumer; that there is no such authority in the statutes which would authorize the challenged portions of the regulations; and that the statutes imply the negation of such power. Appellant's above-

stated contentions are based primarily upon its construction of Articles 1109a and 1110c, V.A.C.S. Appellant points out that nowhere in Article 1109a, V.A.C.S. or in other statutes is it even hinted that the Legislature contemplated anyone besides the system operator itself making required extensions; that the lawmakers went to great pains to secure a sufficient portion of the systems' income from other liabilities so that it might be freed for expanding the system; that the statutory provisions authorize various forms of debt financing for extending the system, i.e., bonds, notes and warrants; that adequate financial resources are thus provided; and appellant says that appellees here cannot under applicable statutes, properly rest their claimed inability to defray water main extension cost upon inadequate revenue alone; that, under Article 1109a, appellees have a statutory obligation to make "all * * * extensions necessary to render efficient service."

Appellant's amicus curiae takes the position that express statutory language imposes a duty on the city-owned utility to finance reasonable water service extensions. It says that article 1109a, and section 2 thereof, shows that the legislature intended for rates to be sufficient for financing the costs of such extensions, and expressly provided various methods for such financing as follows: (1) Article 1109a, which allows issuance of bonds and notes to finance water system extension, (2) Article 1109a–2 which allows issuance of warrants (without voter approval) to finance water system extensions, (3) Article 1175, which allows cities to allocate revenues from sale of water to finance water system extensions, (4) Article 1109, which allows cities to exercise the right of eminent domain in acquiring water system extensions, and (5) Lastly, that cities have available to them the borrowing power of developers under refund contracts.

Appellant further contends that Article 1110c, V.A.C.S., known as the "Grand Prairie" bill, enacted in 1963, and amended in 1967, reflects the state of the law prior to its passage to be that express statutory authority was required for water main assessments, that cities did not theretofore have that power; that extension costs were to be absorbed by the entire system and not just benefitted properties; that cities in furnishing water service act in a proprietary capacity.

Sections 19 and 19–A of Art. 1110c, V.A.C.S. as originally enacted provide as follows:

"Sec. 19. No assessment or other charge permitted by this Act shall be made for the construction of improvements to any water or sewer system against any property or the owners thereof unless such property is in an area which has been subdivided or platted for a period of at least ten years next preceding the effective date of this Act. For purposes of determining property of areas to which this Act shall apply, 'Subdivided or platted property' shall mean such property as has been duly platted under the terms of Article 974–A, V.A.T.C.S. or any property which has been subdivided or platted by map or plat filed for record in the office of any county clerk, by the terms of which map or plat there has been made any dedication of the property to the public use for a street or alley right-of-way or for public utility easements.

"Sec. 19–A. It is the intention of the Legislature, due to the emergency nature of this Act, that nothing contained herein shall be construed to effect any change in any way in the law of this state, whether promulgated by Statute or court decision, either or both, relating to the duty of a city in its proprietary capacity to furnish water and sewer service, either or both."

When originally enacted in 1963, Art. 1110c was applicable to a city located in a county having more than 700,000 population. As amended in 1967 the county population requirement has been reduced to

100,000. Section 19 as amended in 1967 now reads as follows:

"Sec. 19. No assessment or other charge for the construction of improvements to any water or sewer system shall be made against any property or property owners, regardless of who initiates the request for said construction, unless such property is in an area which has been subdivided or platted for a period of at least ten years next preceding the effective date of this Act. For purposes of determining property or areas to which this Act shall apply, 'subdivided or platted property' shall mean such property as has been duly platted under the terms of Article 974-a, V.A.T.C.S. or any property which has been subdivided or platted by map or plat filed for record in the office of any county clerk, by the terms of which map or plat there has been made any dedication of the property to the public use for a street or alley right-of-way for public utility easements."

Appellees argue that under Section 2 of Article 1109a the Board is required only to charge and collect "a sufficient rate to pay for 'all operating, maintenance, depreciation, replacement, betterment and interest charges,' and principal. A requirement to charge a sufficient rate for extensions is nowhere to be found in the statutes." I do not agree with this position. Analysis of the statute and consideration of case law on the subject refutes appellees' contention. In the case of City of Houston v. Allred, 123 Tex. 334, 71 S.W.2d 251 (1934) our Supreme Court refused a writ of mandamus sought by the City of Houston to compel the Attorney General to approve the transcript concerning issuance of $2,502,000.00 of water works bonds issued pursuant to an ordinance enacted November 3, 1933. The mandamus was refused based upon objections by the Attorney General and certain bondholders who were owners of bonds issued in 1926 under the provisions of Article 1109a, as it then existed. The de-

cision was after the 1933 amendments to Article 1109a. It should be noted that the 1939 amendment to said statute made changes which authorized issuance of additional revenue bonds on a subordinate basis, and the 1953 amendment authorized additional bonds on either a subordinate or a party basis. In deciding the case, the Supreme Court construed Article 1109a, V.A.C.S. as follows:

"The first subdivision of article 1109a as it existed when the 1926 bonds were issued expressly authorized cities of more than 160,000 inhabitants to mortgage and incumber their water systems and the income thereof. It also authorized such cities to mortgage and incumber the additions, extensions, enlargements, additional water powers, and riparian rights of such systems, and the income therefrom, either separately or with such systems. After making provision for the incumbrances above mentioned, article 1109a, in subdivision 2 thereof, expressly provided that, when the income of the water system was incumbered, the expense of operation and maintenance should be a first lien and charge against such income. *This section then made provision for charging rates sufficient to pay operating expenses and the interest and principal of the obligation secured by the plant income. The statute carefully defines what was meant by operating expenses and maintenance, including therein 'all salaries, labor, materials, interest, repairs, and extensions, necessary to render efficient service,' etc. The statute then carefully required that the city shall charge and collect 'a sufficient rate to pay for all operating, maintenance, depreciation, replacement, betterment and interest charges, and for interest and sinking fund,' etc. * * *."* 71 S.W.2d 258. (Emphasis supplied)

Under City of Houston v. Allred it is clear that operating expenses and maintenance include, among other things "extensions". Furthermore, Section 2 of Article 1109a provides not only that there shall

be charged and collected for such services a sufficient rate to pay all operating and maintenance expenses but also for an interest and sinking fund for the bonds mentioned in Section 1 of that statute. Since the decision in City of Houston v. Allred, supra, Article 1109a has been amended on two occasions (1939 and 1953). However, the first paragraph of Section 2 thereof has remained in substantially the same wording since its original enactment in 1925. The changes which have been made in it either by addition or deletion are not material to the question now under consideration.

The 1939 amendments made by the 46th Legislature (Ch. 6, pp. 99–102) to the 1925 Act (Ch. 33, 39th Leg.) as amended by the 43rd Legislature (Ch. 36, first called Session 1933), codified as Art. 1109a, V.A. C.S., show the legislative intent to provide additional and adequate financing arrangements so that cities might make extensions, etc. by issuing bonds and warrants. Section 5 of the 1939 Act provides as follows:

"Sec. 5. The fact that the Water Department improvements, extensions, repairs and additions are urgently needed by the cities which come within the scope of this Act and that the health of the inhabitants of such cities is endangered by reason of the lack of such improvements, and the lack of said improvements has created a serious fire hazard and the fact that the Statutes hereby amended have resulted in unreasonable hardship upon said cities in that the areas of said cities are rapidly expanding and the population of said cities has greatly increased and said cities are unable to finance the necessary and essential improvements, extensions, repairs and additions to their water system, and sewer systems and sewage disposal plants and systems, because of the fact that the Statutes hereby amended prevent the issuance of additional water revenue bonds and warrants until all such outstanding revenue bonds and warrants are finally paid in full and many of these outstanding bonds and warrants will not mature until the expiration of many years from this date, create an emergency and an imperative public necessity requiring that the Constitutional Rule requiring all bills to be read on three separate days, be suspended, and it is hereby suspended, and that this Act be in full force and effect from and after its passage, and it is so enacted."

I agree with appellant's contention that there is no express statutory authority for imposing capital costs of extensions on customers, except under Art. 1110c, V.A. C.S., which applies only to areas which have been subdivided or platted for at least ten years prior to its enactment, and to cities or towns located in counties above the stated population figure. That fact situation is not here involved. The applicable Statutes authorize the city-owned utility to use various adequate methods for financing the costs of extensions and other capital expenditures, and generally contemplate that such capital costs are to be provided by the city-owned utility, not someone else. The Statutes expressly recognize that expenses must be incurred for operating and maintenance of the system as well as for servicing of bonds. Capital expenditures for extensions are recognized as a part of maintenance and operation and may be made so as to constitute a first lien and charge; and expenditures for extensions may also be made out of the proceeds of bond issues. The Statutes further recognize and require that a sufficient rate shall be charged to pay for all such expenditures, for maintenance and operation *and* for an interest and sinking fund for bonds.

III.

THE REASONABLENESS IN FACT OF A REQUEST FOR EXTENSION. THE FACTORS OF REASONABLENESS. THE REFUSAL OF THE REGULATIONS TO RECOGNIZE REASONABLE EXTENSIONS.

The question of the reasonableness in fact of a request for an extension of water mains will now be discussed.

We have not been cited to any Texas case which is squarely in point relating to the duty of a municipal water utility to make reasonable extensions of its water mains or concerning the rights of customers or potential customers to require such extensions within the area to be served by said utility. The cases from other jurisdictions throw considerable light on the subject, and I will discuss those which I find to be persuasive.

In 56 Am.Jur., Waterworks, Sections 60 and 62, pages 964 and 967, the general rules applicable to a privately-owned water utility relating to extension of service and the reasonableness of demand for extension are discussed.

Many of the text statements made in the above-cited sections of American Jurisprudence are supported by the leading case of Lukrawka v. Spring Valley Water Company, 169 Cal. 318, 146 P. 640 (Sup.Ct. California 1915). There certain residents of the City of San Francisco filed suit for mandamus against a privately-owned water utility to compel it to extend its water mains and to provide them with water. The lower courts denied the relief sought and rendered judgment for the water company. The Supreme Court of California reversed the lower courts and granted the mandamus. The primary holding was that by accepting the franchise the water company had also assumed the obligation "to anticipate the natural growth of the municipality it had undertaken to serve as a whole; and to take reasonable measures to have under its control a sufficient supply of water to meet the reasonable demands for water by the growing community." In reaching its decision the court had much to say concerning the right of a customer to require a reasonable extension of water mains and the duties of the company in connection therewith. The record there reflected that some of the plaintiffs, (proposed new customers) could be supplied with water if the water company extended its mains by lateral connections for a distance of 50 feet along certain avenues on which those plaintiffs resided, and that in order to supply all of the plaintiffs, the water company would be required to install lateral connections with the Geary Street main extending some 2,000 feet southerly along the avenues upon which the greater number of the plaintiffs resided. The Court held in part as follows:

"We are of the opinion, therefore, for the reasons given and under the authorities we have referred to, that when the respondent accepted the franchise offered by the state, and undertook to supply the municipality of San Francisco and its inhabitants with water, it assumed a public duty to be discharged for the public benefit; a community service commensurate with the offer of the franchise which involved the duty of providing a service system which would be reasonably adequate to meet the wants of the municipality, not only at the time it began its service, but likewise to keep pace with the growth of the municipality, and to gradually extend its system as the reasonable wants of the growing community might require, and, as it appears from the petition in this case that respondent is in a position to discharge this duty towards petitioners by a reasonable extension of its mains, it should have done so on their demand, and, having refused, may be compelled to do it."

"In reaching this conclusion it is, of course, to be borne in mind that the right of an inhabitant of the municipality or the inhabitants of a particular portion of it to compel the service to them by the water company through the extension of its system is not an absolute and unqualified right. The fact that the water company has undertaken to serve the entire municipality, and that it would be of advantage to an inhabitant thereof, or a number of them, to have the water system extended to supply them, would not of itself be sufficient to require or compel the company to make the extension. The duty which the water company has un-

dertaken is of a public nature and to meet a public necessity for the supplying of water to the community. The obligation of the company is not to supply each or any number of inhabitants of the municipality on demand as an absolute right on their part, but it has only assumed and become charged with the public duty of furnishing it where there is a reasonable demand for it and a reasonable extension of the service can be made to meet the demand. *The right to require the service and the duty of furnishing it by an extension of the water system is to be determined from a consideration of the reasonableness of the demand therefor.* It would hardly be claimed that the obligation of a water company exercising a public service franchise would require it on the demand of an inhabitant of the city, or even a number of them, residing at a long distance from a point in the city to which its mains are already extended, to further excavate the streets of the municipality at its own expense and extend its mains to them, where the rates to be charged for the water to be delivered would but to a slight extent compensate the company for the expenditures entailed in doing so; in fact, without any certainty that there would be a continuous consumption of water or a continuous payment of rates even after it was brought to them. On the other hand, where the extension of an existing main, if made only for a few feet, would supply the water service, the demand for making such an extension would obviously be a reasonable one, as the rates to be charged would ordinarily compensate for the expenditure made by the company. *Between these particular cases suggested there is a wide field for the play of the rule of reasonableness of demand for service, and whether it does or does not exist must be determined by a court as a fact in each particular case where it is sought to compel an extension of service.* Of course, the matter of expenditure to be entailed by the public

service company in extending its service is not a controlling feature in determining the reasonableness of a demand for it, because the water rates established as a whole between the public service corporation and the city by the public body to which that duty is committed must be sufficient to yield a fair, just, and reasonable income on the property of the company devoted to public use, which would include such necessary expenditures. But additional expenditure by the company or an additional burden on the water rate payers as a whole should not be imposed for the benefit of a particular portion of the community unless a reasonable necessity for it exists. Whether it does or not is to be determined by a consideration of the facts in each particular case, and, among other things, by a consideration of the duties of the company, the rights of its stockholders, the supply of water which the company may control for distribution, the facilities for making extensions to a locality beyond its present point of service, the rights of existing customers, the wants and necessities of the locality demanding it, and how far the right of the community as a whole may be affected by the demanded extension. We refer to this matter of reasonableness of demand to be considered in determining the right to require the extension of service on account of the general language used in the authorities cited in sustaining the implied obligation of a public service corporation under its charter to supply all the inhabitants of a municipality with water. While this is the obligation it undertakes, the right of the inhabitants of the municipality to have it discharged is, as we have said, not an absolute, but a relative, one, which may be enforced only when conditions are such that there exists a reasonable demand for the fulfillment of the obligation. *In the case at bar the facts charged in the petition show that there is such a reasonable demand for such an extension, and, as there is a liability on*

*the respondent under such circumstances to comply with it, it may be compelled to do so."* (Emphasis supplied)

Appellant relies on several decisions of the courts of New Jersey involving a developer by the name of Reid and a town named Parsippany-Troy Hills Township. These cases are Reid Development Corp. v. Parsippany-Troy Hills Township, 10 N.J. 229, 89 A.2d 667 (1952); Reid Development Corp. v. Parsippany-Troy Hills Township, 31 N.J.Super. 459, 107 A.2d 20 (1954); Lake Intervale Homes v. Parsippany-Troy Hills Township, 28 N.J. 423, 147 A.2d 28 (1958). These decisions involve the issue of reasonableness as well as other questions.

In the first Reid case there was an action in lieu of mandamus to compel the township to extend its water mains a distance of 600 feet to Reid's subdivision. The governing body of the township advised Reid that he would have to pay the full cost of extension unless he increased the front footage of his lots to 100 feet. Reid refused to do so. The lower court denied Reid the relief sought, but the Supreme Court reversed and remanded, holding that wholly extraneous considerations had governed the exercise of discretionary authority. In deciding the case the court discussed some of the basic principles involving the ownership and operation of a municipal water utility. It appears that the New Jersey cases recognize the basic proprietary function which is involved, but also that in some respects a governmental discretion as to extension of water mains may be properly exercised. In the first Reid case the court held there was an abuse of authority and discretion and that Reid had a right to the requested extension. The court discussed some of the factors of reasonableness such as the need for the extension, its cost and the return to be expected from it. The court pointed out that it had theretofore been the practice of the Township to provide extensions of its mains under a revenue-refund agreement with the developer. It also appeared that after entry of the judgment in the low-

er court, the governing body of the township had adopted an ordinance under which the "old terms" were no longer permissible, and required the developer to pay the entire cost of the extensions and to dedicate the title thereto to the township. The new ordinance also provided that an "individual" should pay for his own extension; and that the granting of extensions "shall rest solely within the discretion" of the governing body and the township shall not be under the duty of reimbursement "for all or any part of the cost thereof" but the township may construct such extensions "as a general township obligation in such streets, avenues or roads where if in its discretion, it deems the public interest will be served by the making of such extensions." This ordinance was held void for want of a norm or standard governing the exercise of the discretionary authority. The court held in part as follows:

"* * * The provision of water for the public and private uses of the municipality and its inhabitants is the exclusive province of the local agency; and it is elementary that the exercise of the power must be in all respects fair and reasonable and free from oppression. There can be no invidious discrimination in the extension of the service thus undertaken by the municipality as a public responsibility. Equal justice is of the very essence of the power. Impartial administration is the controlling principle. The rule of action must apply equally to all persons similarly circumstanced. There is a denial of the equal protection of the laws unless the water service be available to all in like circumstances upon the same terms and conditions, although the rule of equality may have a pragmatic application. Persons situated alike shall be treated alike. Washington National Insurance Co. v. Board of Review, 1 N.J. 545, 64 A.2d 443 (1949); Librizzi v. Plunkett, 126 N.J.L. 17, 16 A.2d 280 (Sup.Ct.1940); Millville Improvement Co. v. Millville Water Co., 92 N.J.Eq. 480, 113 A. 516 (Ch.1921); Yick Wo v. Hop-

kins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); People v. Kuc, 272 N.Y. 72, 4 N.E.2d 939, 107 A.L.R. 1272 (Ct.App. 1936).

"There are cases holding that the establishment of a water system and its operation for protection against fire and other dangers to the public health and safety constitute a governmental function comprehended in the police power of the municipality. City of Chicago v. Ames, 365 Ill. 529, 7 N.E.2d 294, 109 A.L.R. 1509 (Sup.Ct.1937); Canavan v. City of Mechanicville, 229 N.Y. 473, 128 N.E. 882, 13 A.L.R. 1123 (Ct.App.1920). *But there is general agreement that the distribution of water by a municipality to its inhabitants for domestic and commercial uses is a private or proprietary function which in its exercise is subject to the rules applicable to private corporations.* This is the rule in New Jersey. Lehigh Valley R. R. Co. v. Jersey City, 103 N.J.L. 574, 138 A. 467 (Sup.Ct.1927), affirmed 104 N.J.L. 437, 140 A. 930 (E. & A. 1928); Fay v. Trenton, 126 N.J.L. 52, 18 A.2d 66 (E. & A. 1941). See, also, Olesiewicz v. City of Camden, 100 N.J.L. 336, 126 A. 317 (E. & A. 1924).

"A public water company is under a duty as a public utility to supply water to all inhabitants of the community who apply for the service and tender the usual rates. The obligation includes the establishment of a distributive plant adequate to serve the needs of the municipality and the enlargement of the system to meet the reasonable demands of the growing community. The utility is under a duty to serve all within the area who comply with fair and just rules and regulations applicable to all alike. The obligation is enforceable by mandamus. Bordentown v. Anderson, 81 N.J.L. 434, 79 A. 281 (E. & A. 1911); Woodruff v. [City of] East Orange, 71 N.J.Eq. 419, 64 A. 466 (Ch. 1906); Millville Improvement Co. v. Millville Water Co., cited supra. While it has been held that a municipality so engaged exercises a governmental discretion as to the extension of the water mains, governed largely by the extent of the need and economic considerations, the discretionary authority must be fairly and reasonably used; and the remedial process of mandamus may be invoked for an abuse of discretion if the extension be arbitrarily refused. Lawrence v. Richards, 111 Me. 92, 88 A. 92, 47 L.R.A., N.S., 654 (Sup.Jud.Ct.1913); City of Greenwood v. Provine, 143 Miss. 42, 108 So. 284, 45 A.L.R. 824 (Sup.Ct.1926); Lukrawka v. Spring Valley Water Co., 169 Cal. 318, 146 P. 640 (Sup.Ct.1915). See, also, 47 L.R.A.,N.S., 656; 56 Am. Jur. 964, et seq. *It would seem that no sound distinction can be made, in respect of the extension of the service, between a municipality which has undertaken to provide water to the community and a water company performing the function of a public utility.* In City of Chicago v. Northwestern Mut. Life Ins. Co., 218 Ill. 40, 75 N.E. 803, 804, L.R.A.,N.S., 770 (Sup.Ct.1905), it was held that when a municipal corporation not obliged to furnish water to its inhabitants undertakes to do so, it proceeds 'not by virtue of the exercise of the power of sovereignty,' but rather engages in 'a busness which is public in its nature, and belongs to that class of occupations or enterprises upon which public interest is impressed', and is under a duty to act reasonably and not arbitrarily in the fulfillment of that function and to 'serve all who may apply on equal terms.'" (emphasis supplied)

In the second Reid case (31 N.J.Super. 459, 107 A.2d 20) an extension was requested into the same general area involved in the first case (10 N.J. 229, 89 A.2d 667). By then the Township had enacted another ordinance requiring that developers pay the entire cost of water main extensions. Reid sued to compel the Township to make the extension without his complying with the ordinance and to set aside the ordinance as invalid. The intermediate New Jersey Appellate Court affirmed the judgment of the lower court denying the particular

extension. The court pointed out that the prior 600 foot extension which had been made after the first Reid case did not have a single customer and no revenue had been realized from it. The court also discussed various factors relating to the reasonableness of a requested extension of water mains and held that an abuse of discretion was not established in the light of factors of need and economic considerations. But the court held that the ordinance was invalid because there was no statutory authority for imposition of the costs of new mains on the developer. The second *Reid* case holds in substance that even where governmental discretion is involved, that requests for water main extensions must be determined on their merits and tested by the reasonableness thereof; that if a request for extension is not reasonable in fact, the municipally-owned utility may decline to pay the costs of making it; but in the absence of statutory authority such costs may not be imposed on the developer.

In the third case where Reid was involved (28 N.J. 423, 147 A.2d 28) it appeared that he had acquired the interest of Lake Intervale Homes, a corporation, in certain lots scattered throughout the subdivision. Reid demanded water extensions from the Township which was refused. By then a State Planning Act of 1953 and a new Township ordinance had been passed pursuant thereto. The ordinance imposed extension costs on the developer without provision for refund. Reid and the Township agreed that he would install the mains initially at his expense without prejudice to his rights and could sue for refund. The lower court allowed Reid to recover $6,000.00 representing a portion of his costs for the extensions made, that amount being the limit of liability of the Township under the agreement. The Township appealed, and the Supreme Court of New Jersey affirmed the judgment, holding that the ordinance there involved was arbitrary and discriminatory. The court held in part as follows:

"The municipality, as we have previously stated, has adopted no standards or regulations to which applicants for service of the kind in question may turn for guidance as to the manner in which the discretion will be exercised. This omission may be contrasted with the statute regulating the duty of private utilities in this regard and with the regulations of the Board of Public Utility Commissioners adopted thereunder with respect to the cost of extensions of mains when requested by developers. Board of Fire Commissioners of Fire District No. 3, Piscataway Tp. v. Elizabethtown Water Co., 27 N.J. 192, 142 A.2d 85 (1958). Under the pertinent rule of the Board, a developer who is ordered to make a deposit to cover the original cost may recoup the entire sum over a prescribed period of time if the revenue produced from the new consumers meets certain requirements. Board of Public Utility Commissioners, Tentative Draft of Regulations for Electric, Gas, Water and Sewer Utilities, Reg. 408.1 p. 39 (October 11, 1958).

"It does not seem amiss to suggest that even where a municipality operating its own water system does not have a subdivision regulation ordinance (which clearly requires standards to be set forth) that promulgation of general standards to regulate the matter of extensions would greatly facilitate the task of judicial appraisal of the exercise of the governmental discretion."

The New Jersey cases support appellant's contentions and to me are highly persuasive. Although under New Jersey law there is a governmental discretion in some respects, these cases emphasize the basic proprietary function involved in the furnishing of water service to customers by a municipally-owned water utility. They hold that the test of reasonableness is applicable in such case and is an essential factor in the exercise of discretion by the municipally-owned utility in passing upon requests for extensions; and that the rules applicable to private utility corporations furnishing utility service are applicable to distribution of water by a

municipally-owned utility. These cases also recognize the existence and propriety of the refund-revenue arrangement in a situation where a developer makes the initial capital outlay for water mains and is given opportunity to recover such expenditure out of revenues received by the utility from the extension made.

I am unwilling to hold that a city-owned water utility exercising a monopoly within its city limits has a lesser obligation under Texas law than a privately-owned utility with a franchise (which cannot be exclusive) which obligates it to furnish water service to customers in the area.

## FACTORS OF REASONABLENESS

The factors of reasonableness will now be discussed. In 43 Am.Jur., Public Utilities and Services, Section 48, pages 602-603, there appears a compilation of factors bearing on the reasonableness of a demand for extension, as follows:

"§ 48 Reasonableness of Demand for Extension.—The right of an inhabitant or group of inhabitants of a community or territory served by a public service company to demand an extension of service for their benefit is not absolute and unqualified, but is to be determined by the reasonableness of the demand therefor under the circumstances involved. The duty of a public service company to extend its service facilities, and the reasonableness of a demand for such extension, depend in general, upon the need and cost of such extension, and the return in revenue which may be expected as a result of the extension; the financial condition of the utility; the advantages to the public from such an extension; and the franchise or charter obligation to make such extension. In this last respect, a water company may be compelled to extend its mains so as to supply all the inhabitants of the municipality by which it is franchised, if its charter requires it so to do. Furthermore, although a franchise ordinance provides that a

water company need not extend its water mains along any ungraded street or alley, still, if the company has voluntarily extended its main along such a street, it cannot refuse to supply a customer thereon, on the theory that it was not compelled to build along that street in the first place.

"In regard to the reasonableness of the cost which an extension will entail, it is not necessary that a particular extension of service shall be immediately profitable, or that there shall be no unprofitable extensions, the criterion being generally whether the proposed extension will place an unreasonable burden upon the utility as a whole, or upon its existing consumers. As to the costs involved in making an extension, various elements, such as the type or quality of construction to be used and the use of any existing equipment or facilities, enter into the determination of this matter. But while the utility cannot fix the limits of the proposed extension at territory which will yield an immediate profit, and, on the other hand, cannot be required to make unreasonable extensions, there is a point midway between these extremes at which the utility may require of the proposed consumer assistance in the necessary outlay in furnishing the service. In this respect, various methods have been adopted, depending upon the circumstances of the particular cases, in determining the amount of contribution or assistance which may be required. It has been held, however, that the utility cannot compel prospective customers to purchase stock as a condition precedent to extending its service.

"In a number of cases which have arisen under war conditions there has been a departure from the rule that requires the utility to make reasonable extensions at its own expense. However, the abnormal conditions presented by a war, as well as the scarcity of labor and the difficulty in securing capital, do not alone constitute a sufficient ground for determining a

proposed extension to be unreasonable; they should be given due consideration in compelling any particular extension to be made, and where the extension needed is a reasonable one, and the amount of capital is not large, an order requiring the extension will be issued accordingly."

Appellees, after extended argument concerning the alleged governmental powers and discretion of the Board, ultimately recognize that the test of reasonableness is applicable to the actions and regulations of the Board concerning extensions. At page 65 of their original brief, appellees refer to the above-mentioned statement in American Jurisprudence. Appellees then argue that the regulations in question were adopted by the Board only after study and consideration of the factors of reasonableness; and that the provisions which impose the cost of "on-site" mains on developers and new customers without compensation or promise of reimbursement meet the test of reasonableness when its proper factors are considered. Appellees say that there are seven such factors of reasonableness mentioned in the said text statement as follows: (1) The need and cost of the extension. (2) The return in revenue which may be expected as a result of the extension. (3) The financial condition of the utility. (4) The advantages to the public from such an extension. (5) The franchise or charter obligation to make the extension. (6) Whether the proposed extension will place an unreasonable burden on the utility as a whole. (7) Whether the proposed extension will place an unreasonable burden upon the utility's existing customers.

I believe that factors numbers 6 and 7, above-listed, are actually discussed in the text statement in connection with the factor of cost (item number 1); however, I will discuss all seven of such factors in the light of appellees' contentions. The above quoted text statement does not specifically mention the element of growth of the municipality in terms of increased population or number of customers, as is discussed in the text statements heretofore set out or in

the California case of *Lukrawka*, or in the New Jersey cases. However, I believe that such element of growth is closely related to most, if not all, of the factors mentioned, and it will be later discussed in considering them.

At page 78 of appellees' original brief, their position concerning reasonableness is stated as follows:

"It is submitted that under any standard of proof that the record in this appeal shows the Board's Regulations and order (reaffirming the Regulations) to be reasonable and thus lawful based upon the cost of extension, the anticipated revenues from the extension, the financial condition of the system, the advantages to the public, the financial burden that the requested extension would place on the system and the discrimination against existing customers that would result from the proposed extension request."

In may view, appellees' position is not well taken for the reasons now to be stated.

With reference to the factor of need, the regulations recognize that there is a need for an "on-site" main in order that a new customer may receive water service to his home or business. Aside from installation of a meter and the service line connection (for which separate charges are made), the "on-site" main is the last important link in the distribution of water to the customer's property. Without it, there can be no actual furnishing of water by the utility to the customer. The question presented here does not involve the issue of actual need for an "on-site" main, but instead relates to who will pay for it. With reference to the factor of cost, the record reflects that for 7902 lots in new subdivisions of San Antonio to which extensions were made from February 24, 1960 to the end of 1964, a period of almost five years, the average cost for "on-site" mains was $203.00 per lot. For the 39 lots in Crownhill Unit #8, the estimated cost for "on-site" mains was $228.00 per lot. There is

no factor of unusual cost here involved. Unusual distances are not involved. Appellees have laid transmission lines into every area and section of the City of San Antonio, its monopoly area, as well as some outside of its corporate limits. The remaining distribution lines necessary for furnishing water to a customer's property are the "approach" main and "on-site" main. Appellees still recognize and have in effect a refund-revenue arrangement for installation of "approach" mains. The developer or new customer furnishes the initial capital outlay for an "approach" main and is reimbursed for same on the basis of the formula provided in the regulations. The question again is not as to actual cost or any unusual or unreasonable cost of an extension, but again relates to who will pay for it. It is not contended here that the advantages to the public from extensions to new customers depend on who pays for "on-site" mains, the city-owned water utility or the developer or new customer. With reference to the factor of revenue which may be expected as the result of new extensions, appellees' testimony shows that the average system wide gross revenue per customer under existing rates is $50.50 annually, which includes revenue from the extensions made to 7902 lots in new subdivisions during the above-mentioned period 1960–1964 and from other units of Crownhill's subdivision. Some evidence indicates that revenues from Crownhill's other units were higher than the average. There is nothing to show that the revenue to be expected from extensions to the Crownhill lots in question would be any less than the average of $50.50 annually per customer, as above-mentioned.

Ultimately, appellees' position as to the factors of reasonableness is based upon their contentions concerning the effects of inflation. Appellees argue that the dollars and cents cost of making extensions to new customers is higher than it was for old customers; that if the Board bears the whole cost of extensions, including "on-site" mains, to new customers, the invest-

ment required can never be amortized at existing rates; that payment by the Board of the cost of "on-site" mains would place an unreasonable burden upon the utility as a whole and upon existing customers; that the financial condition of the utility will not permit it to pay the presently inflated costs of all extensions, particularly that of "on-site" mains and also to make the other expenditures for the program which the Board has adopted. For these reasons appellees say that the Board can by regulation deliberately shift part of the capital costs ("on-site" mains) to new customers and developers without promise of reimbursement and hope of compensation.

Appellees' argument concerning the presently higher costs of making extensions to new customers as a justification for imposing capital costs on them is a very narrow application of the reality of inflation. We judicially know that inflation has been with us for a long period of time. However, inflation is reflected not only in the increased costs of water utility operations but in most, if not all, of the economic phases of daily living. The cost of goods and services along with wages and income all tend to rise, although the relationship between income and expenses in a given case may not always be the same during economic cycles. Even if it be assumed that the city-owned utility is dealing with the same number of water customers and new extensions are not required, the problem caused by the inflated cost of maintenance, repair and replacements would still be present, and the utility would have to manage and control its business so as to pay such costs. The law provides adequate methods to the city-owned water utility for discharging its obligations in such respect.

I do not believe that appellees' argument concerning inflation places an unreasonable burden on old customers or establishes discrimination against them. On the other hand, it appears that the 1960 regulations in effect cause discrimination against new customers, including developers. The record reflects that the net revenue to be ex-

pected from a new customer, (based upon experience for a period of almost five years of operation under the regulations) is more than sufficient to amortize the capital investment for "back-up" facilities and that net revenues from new customers will produce an additional amount which will be available for other purposes, such as maintenance and servicing of bond issues. New customers, therefore, are thus required to pay for expenditures made for the benefit of existing customers, including "on-site" mains, installed before the regulations in question. Under them, the existing customer is not required to pay for the new customer's "on-site" main, but the new customer, at least in part, is required to bear the expense of the existing customer's "on-site" main and the other improvements made from bond issues. The record also reflects that once an extension of water mains is made to a customer, the Board assumes the maintenance, repair and replacement of same. At the end of their useful life the mains (including an "on-site" main) are replaced at the cost of the Board. It is apparent that an old customer, who did not pay separately for his "on-site" main, receives a replacement for same at the currently inflated cost. The replacement "on-site" main for the old customer may today cost much more than the original one. But the new customer, by paying the same rate as old ones, bears his part of giving the old customer a new replacement "on-site" main at the same cost, for an average lot, as a new one for the new customer. It is further apparent that the inflated cost of maintenance, repair, plant and distribution systems are borne by the new customers along with the old ones. The record further shows that some, apparently a substantial part, of the expenses for general extensions made by the Board are for serving customers outside of the city limits of San Antonio.

Appellees, as above stated, say that if the Board is required to bear the whole cost of extensions to new customers, the capital investment can never be amortized. But this is so because there is not sufficient net

revenue at the current rate for the expenses of the program which the Board has adopted and at the same time to pay for extensions of "on-site" mains which are reasonable in fact. Resolution of the problem of meeting its legal obligations is a matter of policy for determination of the agents of the City and its water utility within the limitations provided by law.

The evidence shows that the financial condition of the city-owned water system is good. The 1964 annual report of the Board (a portion of which is set out in Appendix B hereto) particularly reflects such condition. The conditions which brought about the so-called financial crisis of 1956 have been remedied. There is no satisfactory showing by appellees that if the Board is required to make and pay for reasonable water-main extensions that an unreasonable burden would be placed either on the utility as a whole or upon existing customers.

The higher costs of water-utility operations caused by inflation is not the fault of new customers, old customers or the city-owned utility. They all may properly be called victims of inflation. The problems caused by the effects of inflation are usual ones for most, if not all, individuals and business organizations. As the prices of goods and services rise and the purchasing power of the dollar becomes less, necessary adjustments must be made to meet the situation. One such usual adjustment is to increase income so that funds will be available to meet the increased costs caused by inflation. Another adjustment may be to do without certain items and thereby avoid expense.

In the instant case the city-owned water utility has adjusted to the reality of inflation by adopting a policy which in effect determines that only developers and new customers must bear the brunt of inflation as to "on-site" mains and that neither appellees or old customers will bear their share of the burden caused by economic conditions. The city-owned water utility

has because of inflation thus adopted a policy of shifting capital costs of "on-site" mains to developers and new customers, instead of using the adequate and available means provided by law to pay for same.

In my view, the business of a city-owned water utility must be conducted by its agents so as to deal with the reality of inflation in a manner which is consistent with the legal duties which it owes to customers in its monopoly area. Where a requested extension of water mains is reasonable in fact, the city-owned water utility has a legal duty to discharge to its customers, whether they are developers or new customers or old ones, and cannot avoid such duty by refusing to use the methods provided by law to accomplish such purpose.

## THE REFUSAL OF THE REGULATIONS TO RECOGNIZE REASONABLE EXTENSIONS

Appellees concede that they have a duty "to make water service reasonably available within the city and to treat those similarly situated, equally under the full guarantees of the State and Federal Constitutions." There is no issue presented here concerning the area to be served by the city-owned water utility. Appellees acknowledge that they have the duty to serve all areas within the city limits, including newly developed ones. Exhibits in evidence show that Crownhill Park Subdivision is located in the northern sector of San Antonio and there are other subdivisions located in the general area in all directions from it, some inside and some outside of the city limits. There are existing mains 12 inches and larger in such subdivisions, and there are proposed 12 inch mains to be installed to the northeast of Crownhill and particularly to the north and northwest thereof, both inside and outside of the city limits.

The record herein establishes that the City of San Antonio has experienced tremendous growth and expansion over a long period of time. Its population increased from 253,854 in 1940 to 408,442 in 1950—a growth of 154,588 persons. From 1950 to 1960 there was a population increase from 408,442 to 587,718—a growth of 179,276 persons. The overall population increase from 1940 to 1960 was, therefore, 333,864 persons, an average increase of about 16,693 persons annually for 20 years. The number of water customers increased from 103,996 at the end of 1954 to 135,728 at the end of 1964, a total increase of 31,732, an average increase of 3173 annually, all of which, along with other matters, is shown by Appendix B attached hereto. The authorities heretofore cited, including the Texas decisions (*Wiggins, Kenner, Lockwood* and *Guthrie*), the *Lukrawka* case from California, the New Jersey cases, the text statements from American Jurisprudence and the cases cited in support of same, all support the view that a city-owned water utility, like a privately-owned one having a franchise to serve a certain area, must anticipate the natural growth of the community it has undertaken to serve as a whole and to take reasonable measures to meet reasonable demands for water service by the growing community.

In People of State of New York v. McCall, 245 U.S. 345, 38 S.Ct. 122, 62 L.Ed. 337, (1917), the court held in part as follows:

"These references to the evidence will suffice. They show this Public Service Commission ordering a public service corporation to render an important public service, under conditions such that in the aspect least favorable to the Gas Company the initial return upon the investment involved would be low but with every prospect of its soon becoming ample, and also that no claim was made by the company that the comparatively small loss which the company claims would result would render its business as a whole unprofitable.

"Corporations which devote their property to a public use may not pick and choose, serving only the portions of the

territory covered by their franchises which it is presently profitable for them to serve and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render. * * *"

In People of State of New York ex rel. Woodhaven Gaslight Co. v. Public Service Commission of New York, 269 U.S. 244, 46 S.Ct. 83, 70 L.Ed. 255, (1925), the court held in part as follows.

"The company has long had the privilege of laying gas mains in the streets and other public ways of the town of Jamaica (now the Fourth ward of the borough of Queens) to distribute gas for street lighting and other purposes. It does not appear that any other utility is authorized to furnish gas there, and it is to be assumed that these communities are dependent upon this company for service. *When reasonably required, the company is in duty bound to furnish gas to inhabitants of the territory covered by its franchise.* People ex rel. Woodhaven Gas Co. v. Deehan, 153 N.Y. 528, 533, 47 N.E. 787. And the commission is empowered by statute to require reasonable extensions of the mains and service. Section 66 (2), Public Service Commissions Law, supra. In the territory already served by the company there are 150 consumers per mile of main. The sections for which service is ordered are residential communities. They have had water and electric service for many years. The houses already there, and those being built, are of a kind to indicate that, if brought within reach, gas will be used by the larger part of the inhabitants. There are good prospects of growth in the immediate future. The facts justify reasonable anticipation of a substantial and increasing demand for gas in the territory to be reached by the extensions."

* * * * * *

"It reasonably may be held that the location, present development, and prospects of growth of the communities ordered to be served justify the extension to them of gas service, if a nonconfiscatory rate can be obtained.

"But the company construes the order to require it to sell gas in the added communities at the existing rate, and it insists that, as the rate is so low that present consumers must be served at a loss, the addition of new territory will increase the loss. Even assuming that $1, fixed as the maximum rate, is noncompensatory, it does not follow that the order in question is unreasonable or invalid. This case is to be distinguished from a suit to restrain the enforcement of legislation prescribing a confiscatory rate. Here the rate is not involved. The order directs the extension; it does not deal with compensation. *The commission reasonably might assume that the company will take appropriate steps to save its property from confiscation.* Newton v. Consolidated Gas Co., 258 U.S. 165, 174, 177, 42 S.Ct. 264, 66 L.Ed. 538. * * *" (Emphasis supplied)

In Ridley v. Pennsylvania Public Utility Commission, 172 Pa.Super. 472, 94 A.2d 168 (1953) the court said:

"A public utility cannot collect the cream in its territory and reject the skimmed milk. 'A public service corporation may not "pick and choose" only presently profitable territory covered by its franchise. If a portion of the territory served is not profitable, but the entire service produces a fair return on the investment, the utility may still be required to serve the unprofitable portion, if the rendering of such service does not result in an unreasonable burden on its other service.' Phila. Rural T. Co. v. Public Service Comm., 103 Pa.Super. 256, 261, 158 A. 589, 591. Although the Company does not enjoy a monopoly in the Township it is obliged to render service within a reasonable distance from its distribution system, and if it takes only the profitable business no other water company will enter the area to pick up the unprofitable business which it declines. No other

company will become 'a snapper-up of its unconsidered trifles.'

"The reasonableness and validity of the Commission's suggestion that appellants bear part of the cost of the extension rests upon the same factors hereinbefore discussed. *Ordinarily, it is not the business of the citizen or consumer to construct any part of a utility's system.* There are, doubtless, instances where, under special circumstances, warranted by the evidence, the Commission may, in the exercise of its administrative discretion, withhold exercise of its power unless patrons offer to participate in the cost of construction. Altoona v. Pa. P. U. C., 168 Pa.Super. 246, 77 A.2d 740. But no inflexible rule can be laid down; *participation in construction costs cannot be exacted indiscriminately; and it cannot be required upon a mere showing that an extension will not immediately produce an adequate profit. The action of the Commission must rest upon evidence which shows that, without the contribution or loan of the consumers, the cost of construction would materially handicap the utility in securing a fair return on all its operations.* Riverton Consolidated Water Co. v. Public Service Comm., 105 Pa.Super. 6, 159 A. 177. *Such proof, as already indicated, is lacking.*

"*The obligation imposed upon the Commission to exercise its powers and discretion reasonably applies as well to patrons and the public as to the utilities.* The Commission operates on a two-way street. '*The primary object of the public service laws is not to establish a monopoly or to guarantee the security of investment in public service corporations, but first and at all times to serve the interests of the public.*' Hoffman v. Public Service Comm., 99 Pa.Super. 417, 429. * * *"

\* \* \* \* \* \*

"This case does not fit in the factual pattern of the precedents upon which the Company relies. Appellants do not reside in a small hillside settlement without prospects of future development or in a moribund mining village. *They are residents* of suburban Philadelphia, adjacent to the City of Chester, within a few minutes of travel to the center of the metropolis, and *of a community whose increase of population during the last decade denotes civic stability and presages continued healthy growth and expansion.* Nothing in the record suggests 'over development or premature development of scattered sections of' the Township 'in advance of its normal growth', and while the immediate returns from the extension may not now equal the overall return of the Company *it cannot be said, on this record, that 'there is no rational expectation of the event justifying the expenditure.' These people are entitled to fire protection and domestic water service without subsidizing a large and prosperous utility.*" 94 A.2d 171–172. (Emphasis supplied.)

It is apparent that the principal vice in the regulations is that they do not recognize that there is any such thing as a reasonable extension of "on-site" water mains. The city-owned water utility will not pay for same in any event, no matter how reasonable in fact the extension may be. The out of State cases recognize that there is a midway situation between extensions which a Municipal Water Utility is required to make and those which it is not required to make at its initial or whole cost. This midway situation has been met by various methods. One of these is the so-called revenue-refund contract, under which the developers or new customers furnish the original capital outlay required to make the requested extensions with the right to reimbursement for same from a percent of revenues from water sold by the Municipality because of the particular extensions. This method is sometimes the subject of a contract and in some jurisdictions is provided for by orders of Public Utility Commissions or similar bodies. In such case the utility ultimately contributes to the capital outlay only to the extent that actual sales of water produces revenue to furnish

the same. If there are no sales of water the Utility is not required to make any capital expenditures for the particular extension. On the other hand the developers or new customers who furnish the necessary capital expenditure in order to receive water are given an opportunity to be reimbursed to the extent that actual sales of water from the facilities which they have paid for contribute to the capital outlay. The revenues may be sufficient over a period of time to completely reimburse them for their capital expenditure; but, if not, they lose to that extent. In other words, a particular extension is determined to be reasonable or not reasonable in the light of experience. See City of Nederland v. Callihan, 299 S.W.2d 380 (Tex.Civ.App.1957, writ ref. n. r. e.); Ridley v. Pennsylvania Public Utility Commission, supra.

The reasons advanced by appellees in support of the regulations are not legally sufficient to justify the provisions here in question when tested by the proper factors of reasonableness. These matters will be further considered in connection with the questions of discrimination, equal protection and due process of law.

I agree with appellant that a Municipal Water Utility, such as the one here in question, has the duty to make extensions of its water mains, including "on-site" mains, at its own cost, where the request for such extension is reasonable, considering its proper factors. The regulations in question violate that rule by adoption of a policy which fully and finally shifts the capital cost of "on-site" mains to the developer and new customer in all cases.

### IV.

### WHETHER A PROPRIETARY OR GOVERNMENTAL FUNCTION IS EXERCISED BY THE BOARD IN PROMULGATING REGULATIONS. POLICE POWER ARGUMENT.

On this phase of the case appellant's first point of error along with appellee's first counterpoint will be considered.

Appellant's first point is as follows:

"The trial court erred in concluding that appellees act in a legislative or governmental capacity in prescribing rules and regulations for the operation of their municipal water supply system."

Appellees' first counterpoint reads as follows:

"The trial court correctly ruled that the City of San Antonio in prescribing regulations governing the extension of water service acts in a legislative or governmental capacity."

Here involved are conclusions of law numbers 5, 7 and 8, reading as follows:

"5. Defendant, in owning and operating through its Board of Trustees the municipal water supply system for the City of San Antonio, acts in a proprietary capacity, but in fixing rates and prescribing rules and regulations for operation of such system, it acts in a legislative and governmental capacity."

\*   \*   \*   \*   \*   \*

"7. The Water Works Board of Trustees of the City of San Antonio is an agency of the City of San Antonio authorized by statute and ordinance to manage and control the water works system of the City of San Antonio and said Board has been delegated legislative and governmental powers for such purpose. Article 1109a, Section 4, V.A.T.S., City of San Antonio Ordinance No. 24819, Sec. 27(a).

"8. Except with respect to fixing rates and charges for service, said Board of Trustees has full power and authority, absent constitutional infringement, with reference to: control, management and operation of the system; the expenditure and application of revenues; the making of rules and regulations governing the furnishing of water service; and has full authority with reference to making extensions to the extent authorized by law. Article 1109a, Section 4, V.A.T.S., City

of San Antonio Ordinance No. 24819, Sec. 27(a)."

I agree with the first portion of conclusion No. 5 holding that the "Defendant, (meaning the "City" as hereinbefore defined) in owning and operating through its Board of Trustees the municipal water supply system for the City of San Antonio, acts in a proprietary capacity, * * *" I also agree that the City, "in fixing rates * * acts in a legislative and governmental capacity." I also agree with the first portion of conclusion number 7 holding that "The Water Works Board of Trustees of the City of San Antonio is an agency of the City of San Antonio authorized by statute and ordinance to manage and control the water works system of the City of San Antonio. * * *" However, I disagree with the last portion of conclusion No. 5 holding that the city in "prescribing rules and regulations for operation of such system, * * * acts in a legislative and governmental capacity." I also disagree with the last portion of conclusion No. 7 that "said Board has been delegated legislative and governmental powers for such purpose (management and control)."

Appellant here relies in part on the statutes and cases which I have mentioned in section number II of this opinion, particularly articles 1109a and 1110c and *Wiggins*, *Kenner*, *Lockwood* and *Guthrie*, and the case of City of Big Spring v. Board of Control, 404 S.W.2d 810, 811, 812 (Tex.Sup. 1966), wherein the Court said:

"Under the first point it is argued that by the contract the City of Big Spring surrendered its right to determine the rates to be charged water users for water; that this is a legislative or governmental function, and a contract which is a surrender by the City of such rights is therefore void. Cases discussing governmental functions of a city and its inability to delegate or surrender these functions are cited to sustain this point. We have no quarrel with these cases. In the case we have before us the City is exercising a proprietary or business function only. In such capacity a city can make a contract, under authority of legislative enactment, in all things as an individual or private corporation. City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622 (1952); City of Crosbyton v. Texas-New Mexico Utilities Co., 157 S.W.2d 418, 420 (Tex.Civ.App., 1942, error refused, want of merit); 39 Tex. Jur.2d 638, § 308."

In 39 Tex.Jur. Municipal Corporations, Sec. 308, pages 638–639, the following appears:

"Municipal or corporate functions and acts are those intended primarily for the private advantage and benefit of persons within the corporate limits of the municipality, as distinguished from that of the public in general. Proprietary functions are imperative in part and discretionary in part. They include the proper care of public places, the establishment and maintenance of a municipal band, and the erection, maintenance, ownership, or operation of public utilities, such as gas and electric plants, water works, and street railways."

In City of Crosbyton v. Texas-New Mexico Utilities Co., Tex.Civ.App., 157 S.W.2d 418, 420, 421, the Court said:

"The law is well established in this state, as well as other jurisdictions in this country, that the functions of a city are dual in their nature. One element of such functions is designated as governmental or legislative and the other as proprietary, business or corporate functions. It is hardly necessary to cite authority in support of the proposition that when a city is exercising those functions that are enjoined upon it by law, that is, those which it is bound to assume under the provisions of the statutes of the state or government which gives it life, it is considered to be an arm of the government and is acting for the people generally as an agency of the government. These powers and functions are, therefore, governmental in their nature

and can neither be ceded nor exercised in such manner as to bind the future course of the city or prevent modification or change of its policy if its governing body should thereafter wish to do so."

*    *    *    *    *    *

"In the exercise of its proprietary or business functions, however, such as those which it exercises when it enters into a contract for the private interests of its own inhabitants or of itself, a municipal corporation is limited by no such restriction. It is at liberty to exercise these powers in the same way and to the same extent as individuals or private corporations and it is settled by a long line of decisions of the courts of this state that the ownership and operation of public utilities, such as water works, electric light plants and street railways, is not a governmental function but is proprietary in its nature and constitutes a business or corporate function of the city. City of Ysleta v. Babbitt, 8 Tex.Civ.App. 432, 28 S.W. 702; Green v. City of Amarillo, Tex.Civ.App., 244 S.W. 241; Lenzen v. City of New Braunfels, 13 Tex.Civ.App. 335, 35 S.W. 341; City of Wichita Falls v. Lipscomb, Tex.Civ.App., 50 S.W.2d 867; Community Natural Gas Co. v. Northern Texas Utilities Co., Tex.Civ. App., 13 S.W.2d 184; City of Galveston v. Rowan, 5 Cir., 20 F.2d 501.

*    *    *    *    *    *

"It was under no statutory mandate to own and operate a system of water works nor did the law require it to furnish a system of street lights for the convenience of its urban population."

Appellant's contention is also supported by the case of Boiles v. City of Abilene, 276 S.W.2d 922 (Tex.Civ.App., Eastland, 1955, writ refused) wherein the applicable rules are reiterated as follows:

" * * * The power of the City to regulate rates to be charged for water is governmental in character. Its power to acquire water works and furnish water therefrom is proprietary."

The Eastland Court of Civil Appeals quoted with approval the holdings of the Supreme Court of Oregon in the case of Tone v. Tillamook City, 58 Or. 382, 114 P. 938, in part as follows:

" * * * The power to provide a water system is not governmental nor legislative in its character, but strictly proprietary, and the city, when engaged in prosecuting such an improvement, is clothed with the same authority and subject to the same liabilities as a private citizen. This has been held by this court in an opinion by Mr. Justice Bean, which has become a leading case on this subject. Esberg Cigar Co. v. [City of] Portland, 34 Or. 282, 55 Pac. 961, 43 L.R.A. 435, 75 Am.St.Rep. 651."

*    *    *    *    *    *

" * * * While regulations as to the manner of using the water and management of the business may be prescribed by ordinance or resolution, the legal position of the city is that of a proprietor, * * *."

The authorities hereinabove cited are all in accord with the holdings in San Antonio Ind. Sch. Dist. v. Water Works Board of Trustees, 120 S.W.2d 861 (Tex.Civ.App., Beaumont, 1938, writ refused) concerning the proprietary nature of the function here involved and the functions to be performed by the Waterworks Board of Trustees.

In support of their first counterpoint appellees rely on the cases of City of Wink v. Wink Gas Co., 115 S.W.2d 973 (Tex.Civ. App., El Paso, 1938, wr. ref.) and City of Beaumont v. Calder Place Corp., 143 Tex. 244, 183 S.W.2d 713 (1944). The City of Wink case involved Art. 1119, V.A.C.S., which is applicable to cities and towns incorporated under the general laws of the state. There the Board of Commissioners had originally enacted an ordinance prescribing rates to be charged for natural gas by a privately-owned utility, and later amended it to prohibit the setting of more than one meter to measure gas furnished to one consumer at one location, unless

more than one meter was requested. Violation of the ordinance was made a misdemeanor punishable by fine not exceeding $100.00 for each day of violation. Under the ordinance the rate per thousand cubic feet diminished with increased consumption. The trial court held the ordinance invalid and enjoined its enforcement. The Court of Civil Appeals reversed, holding that the ordinance was reasonable under the provisions of Art. 1119, V.A.C.S., as against the attacks made on it by the privately-owned Gas Company. The holdings of the Court were made in the stated context. Art. 1119, V.A.C.S. is obviously the principal statute applicable to general law cities and towns concerning regulation of privately-owned utilities using the streets and public grounds therein. The rate fixing function is clearly governmental in nature, and that was primarily what the court was concerned with in *Wink*. *Wink* did not involve Art. 1109a, V.A.C.S. or any other statute applicable to a home rule city owning its water utility; nor was there involved any proprietary interest of a city in connection with the utility or ordinance in question.

The case of City of Beaumont v. Calder Place Corporation, supra, is also not in point here. That case ultimately involved a holding by the Supreme Court that certain reservations of title by Calder Place Corporation in its deeds to lots in a subdivision were void. The subdivision had been located outside the city limits when originally developed, but was later annexed to the city. The deeds in question had reserved in Calder Place Corporation the control of all sewer, gas and water mains "until such time as Calder Place shall be taken into the City of Beaumont." The Supreme Court reversed the judgments of the lower courts which allowed Calder Place Corporation to continue exercise of rights of use of water and sewer lines for making additional connections for service to houses outside the Calder Place subdivision. The Calder case is not in point on the issue presented here concerning payment of costs for extensions of water mains.

The majority opinion herein contains the following statement:

"The power of the City of San Antonio which operates under the home rule amendment, is limited only by the provisions of the Federal and State Constitutions and the general state laws. Denman v. Quin, 116 S.W.2d 783 (Tex.Civ. App., San Antonio 1938, err.ref.); Constitution of the State of Texas, Vernon's Ann.St. Constitution, Art. 11, Sec. 5."

Although that statement is correct as far as it goes, it does not take into consideration the well settled rule stated by the Supreme Court of Texas in Southwestern Bell Tel. Co. v. Houston Ind. Sch. Dist., 397 S.W.2d 419, 421, as follows:

"A city has no inherent power to regulate a utility. Whatever powers of this nature municipalities have in Texas are derived only from an express grant from the Legislature. Tri-City Fresh Water Supply District No. 2 v. Mann, 135 Tex. 280, 142 S.W.2d 945 (1940); Davis v. City of Taylor, 123 Tex. 39, 67 S.W.2d 1033 (1934); Texas-Louisiana Power Company v. City of Farmersville, 67 S.W. 2d 235 (Tex.Com.App.1933); Coleman Gas & Oil Company v. Santa Anna Gas Company, 67 S.W.2d 241 (Tex.Com.App. 1933)."

In support of their position that the Board has been delegated governmental and legislative power, appellees rely primarily upon articles 1175, 1108, 1109a, 1111–1118, 1118a, and 974a, V.A.C.S. Some of these statutes have heretofore been discussed. I am of the opinion that such statutory provisions do not confer governmental power on the Board in connection with water main extensions and regulations concerning them. In my view the Board is no more than an administrative agency of the City for the purpose of managing and controlling the water works system. The statutes which are properly applicable here to a city-owned water utility were completed laws when they left the legislature and any powers or duties of the Water Board

are administrative or ministrative in nature. In Acme Refining Co. v. State, 86 S.W.2d 507 (Tex.Civ.App., El Paso, 1935, n. w. h.) the Court held in part as follows:

"The Legislature of Texas has the power to enact a legislative policy and to prescribe general rules of law having for their purpose the conservation of the natural resources of the state and the prevention of waste thereof, and to leave the details of enforcement and administration thereof to an agency, board, or commission, and the board, agency, or commission may promulgate orders, rules, and regulations pursuant to such statutes and policy, in order to carry out the legislative mandate and properly administer the law."

\*　　\*　　\*　　\*　　\*　　\*

"From the articles of the statutes quoted above we find that the Legislature has made it the duty of the commission itself to make and enforce such rules, regulations, and orders as the commission may deem necessary for the conservation of crude petroleum oil and natural gas and to prevent waste. *A commission, agency, or board derives all its powers from the statutes which confer them. Its functions and duties are administrative or ministrative, but we think are neither legislative nor judicial. The constitutional inhibition which prevents the delegation of legislative power does not prevent the grant of authority to make rules, regulations, and orders for the government of a particular subject conferred upon the commission, agency, or board.* It is sometimes difficult to define clearly the line between a delegation of legislative power and a grant of authority to perform acts which are in their nature quasi legislative, but are not strictly so. In this instance the Legislature, in the articles of the statute cited, has enacted the law which governs the commission in the conservation of crude petroleum oil and natural gas and to prevent waste. We have found no constitutional inhibition which prevents the conferring of

such powers. It will be seen from the statutes above quoted that the commission is empowered to adopt rules, regulations, and orders in the exercise of the powers and orders conferred."

I have heretofore pointed out that the 1957 ordinance, in Section 27 thereof, places with the Board the "absolute and complete authority and power with reference to the control management and operation of the System" except as otherwise specifically provided therein. It also expressly provides that the Board "may manage and conduct the affairs of the system with the same freedom and in the same manner ordinarily employed by the Board of Directors of private corporations operating properties of a similar nature." It further recognizes that the power of "fixing rates and charges for service rendered by the system" is in the City Council. Even then the Board is charged with the duty to make recommendations to the City Council concerning the fixing of rates and charges, whether for an increase or reduction. Aside from the rate fixing function, the only other material exceptions to the complete exercise of power by the Board in management and operation of the system are in connection with the appointment of its members and the issuance of bonds. Under applicable Texas Statutes and the 1957 ordinance the exercise of any governmental powers on behalf of the City, particularly in fixing rates, and providing penalties for violations of regulations, remain the responsibility of the City Council, which is the governing body of the City. All remaining powers, which are to be exercised by the Board, relate strictly to management and operation of the system. The Board is the administrative agent of the City owning and operating its water works in a proprietary capacity.

In prescribing regulations for the furnishing of water service to customers, the duly authorized agent of the City (the Water Board in this case) must act in the light of the customers' rights and the duties and obligations owed to them by the water

utility. I find nothing in Article 1109a, V.A.C.S., the basic statute under which the City of San Antonio got into the water business, or under other statutes which may be applicable to city-owned utilities, that would authorize the Board to exercise legislative power and by regulations to restrict basic rights of customers or obligations of the utility within its monopoly area. If appellees' arguments concerning the alleged governmental functions of the Water Board are carried out to a conclusion, the effect would be to convert what is basically a proprietary function of the city into one which is governmental in nature by the expedient of regulations promulgated by the Board. I am not in accord with such view or result.

### POLICE POWER ARGUMENT

Appellees also rely upon Art. 974a, V.A.C.S. That statute relates to plats of subdivisions or additions, the approval thereof by a planning commission or the governing body of a city, and the recording of same. Section 4 thereof, among other things, provides that regard is to be had for access to extensions of water and sewer mains and the instrumentalities of public utilities. Art. 974a does not relate to the payment for extensions of utility services nor does it in any way authorize impositions of water-main costs on developers. The regulations authorized by that statute, which involve exercise of the police power, do not relate to the issues presented here.

Appellees also cite several cases involving exercise of the police power, particularly zoning cases. The majority opinion also places reliance on the recent decision of our Supreme Court in the case of Texas Power & Light Company v. City of Garland, Tex., 431 S.W.2d 511, decided March 27, 1968, and its alleged holdings concerning governmental functions or the police power of a municipality. The opinion on rehearing, reported at 431 S.W.2d 511, July 24, 1968, is not mentioned in the majority opinion. I disagree with the construction placed by the majority on that decision. In that case the Supreme Court held that certain provisions of the city ordinance, relating to a permit for extension of electric lines by a privately-owned utility, were void on two separate grounds; (1) That certain provisions did not qualify as an exercise of the police power promoting legitimate concerns of the government, and (2) that other provisions were "void because they do not state a reasonable standard aimed at protecting the safety or welfare of the public. They in no way control the City's exercise of discretion." The Court quoted from State ex rel. Cleveland Electric Illuminating Co. v. City of Euclid, 169 Ohio St. 476, 159 N.E.2d 756 (1959) in which it was held that a franchise is subject to the police power exercised to.

"* * * Directly promote the general health, safety, welfare or morals * * *; the means adopted to accomplish the legislative purpose must be suitable to the end in view, must be impartial in operation, must have a real and substantial relation to such purpose and must not interfere with the necessity of the situation."

The opinion on rehearing was largely concerned with the question of the lack of adequate standards to govern discretion, and the Court adhered to its original decision holding that provisions of the ordinance were void on the two grounds above stated.

In my view, the decision in Texas Power and Light Co. v. Garland is a complete answer to the reliance of appellees on the police power as a justification for the regulations. The question here relates to payment of the cost of extending "on-site" mains. The regulations do not have a reasonable relationship to the protection of the public health, safety, morals or welfare.

The reliance by appellees and the majority opinion on the case of Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475 (1934) is also misplaced. *Lombardo* is, of course, the leading Texas case on the validity of state statutes and city ordinances

relating to comprehensive zoning laws. Reasonable exercise of the police power in such connection has been upheld in *Lombardo* as well as in many other cases, but that decision is not authority for the view adopted by the majority that a customer of a city-owned water utility can be required to make a "donation" of water mains to it, and has nothing to do with the decisive issue presented here.

I agree with appellant's contention that the Board in prescribing regulations concerning "on-site" mains, does not exercise a governmental function legislative in nature but, on the other hand, acts in a proprietary capacity. However, even if I agreed with appellees' contention that a governmental function is involved in such respect, nevertheless I would hold invalid the provisions of the regulations which fully and finally impose capital costs of "on-site" mains on developers without compensation or promise of reimbursement, for the reasons heretofore and hereafter stated.

## V.

## DISCRETION

Appellant's basic position on the question of discretion is that the Board may exercise sound discretion as to which requested extensions are in fact reasonable; that such discretion must be exercised in connection with the basic proprietary function involved and both statutory and case law fixing the duties of the city-owned water utility, particularly the duty to make all reasonable extensions of service; that the exercise of such discretion is subject to review by the courts, to determine if there is abuse of it; that the regulations constitute a blanket refusal to pass upon requests which may be reasonable and an unauthorized shifting of capital costs to developers and new customers in all cases; that there is an abuse of discretion and a refusal to exercise discretion in specific cases because of the policy adopted by the regulations.

Appellees, by their second, third and fourth counterpoints contend that the de-

termination of what extensions shall be made by a municipal water system is a matter within the sound discretion of the governing body in the exercise of its legislative and governmental powers; that a city is not obligated to make all extensions, but may, to the contrary, expend revenues only for extensions which in the judgment of the governing body are necessary to render adequate service; and that the extensions to be made and the determination of how much of the revenues of the water system should be applied to such extensions of the system is within the sound discretion of the governing body. The trial court agreed with appellees.

It will be noted that appellees use the term "governing body" in their counterpoints without expressly identifying the same with the City Council or the Water Board. However, it appears from appellees' statement and argument that appellees mean the Water Board of Trustees when the term "governing body" is used.

The cases primarily relied upon by appellees to support their position concerning discretionary authority to extend water mains are Crouch v. City of McKinney, 47 Tex.Civ.App. 54, 104 S.W. 518 (Tex.Civ. App., Dallas, 1907, wr.ref.); City of Snyder v. Bass, 360 S.W.2d 426 (Tex.Civ. App., Eastland, 1962, wr. ref. n. r. e.). Johnson v. Benbrook Water and Sewer Authority, 410 S.W.2d 644 (Tex.Civ.App., Ft. Worth, 1966, wr. ref. n. r. e.), was decided after submission of the instant case. Appellees called attention of this Court to *Johnson* by letter stating that it supported their position here and that it reinforced the decision in Snyder v. Bass, supra. Appellant, also by letter, advised this Court of its position that *Johnson* does not support appellees' contentions. That case has not been fully briefed by either of the parties.

A careful analysis of *Crouch, Bass* and *Johnson* will reflect that each of them is distinguishable from the instant case in several respects, and that those cases are not controlling on the question of discretionary authority on the part of the agents

of the city-owned water utility here involved.

In Crouch v. City of McKinney, supra, Crouch filed suit to enjoin the city from furnishing electric lights to private citizens for use in their private and business houses. Among other things, Crouch alleged that such action would decrease the efficiency of street lights already established and prevent the establishment of other street lights needed by the city, and contravened the State Constitution and City Charter; that the city was diverting revenues of the water plant to operation of the electric plant, when such revenues should be applied to betterment of the water system; that the city was furnishing lights at less than cost. McKinney Light & Motor Power Co., the holder of a franchise from the city to sell electric power, intervened and aligned with Crouch. The jury verdict, based upon a general charge, was favorable to the city and judgment was rendered for it. The Court of Civil Appeals held that "under the facts the jury reached the correct verdict, and the judgment is affirmed." The points passed upon by the Court of Civil Appeals related to alleged errors in the charge of the Court and in refusing to give certain charges requested by Crouch. The opinion is lacking in preciseness and some of the holdings are obscure. The language relied upon by appellees is emphasized in the following excerpts from the opinion:

"* * * When the city has a surplus of power, after discharging its duty to the public, there seems to be no question of its authority to sell the excess to private citizens. Nalle v. City of Austin (Tex.Civ.App.) 21 S.W. 380; City of St. Louis v. The Maggie P. (C.C.) 25 Fed. 204; Joyce on Electric Law, § 237; Power Co. v. City of Colorado Springs, 105 Fed. 1, 44 C.C.A. 333. But it is contended that as long as portions of the city remained unlighted there could be no excess of electricity that could be disposed of by the city. This contention we do not think tenable. *The government of*

*the city has been instrusted to a mayor and board of aldermen, and, so long as the affairs of the city are conducted in a reasonably judicial manner, their acts will not be interfered with.* No fraud is alleged on the part of council in conducting the city government, and, 'unless the council is transcending its powers, or some clear right has been withheld, or wrong perpetrated or threatened,' the parties are not entitled to invoke the power of the court. 1 Dillon, Mun.Cor. (4th Ed.) § 95. * * *"

"* * * *The evidence shows that the main portion of the town is supplied with mains and pipes for the distribution of water, and the extension of the water system should be left to the sound discretion of the city council. The proceeds arising from the sale of water was more than sufficient to pay the expenses of maintaining the system as installed, and the surplus moneys or profits derived became current funds, and the council had the right to divert said profits to other needs of the city.* Bank v. City of Terrell, 78 Tex. 450, 14 S.W. 1003. The court did not err in refusing said charge."

It is not clear from the opinion whether the trial court charged the jury as paraphrased in it or refused such charge, although the latter action seems most likely. However, it does appear that the Court of Civil Appeals agreed with the trial court that the city should not be enjoined from selling electricity, and under the conditions the city could utilize surplus funds from the sale of water, as current funds, in connection with putting the surplus electric power which could be generated by its plant to use. *Crouch* did not involve a requested extension for water service nor a policy of the city concerning payment by customers of costs of an extension. The case was decided in 1907, some five years before the adoption of the home rule amendment, and prior to enactment or amendment of various statutes relating to city-owned utilities appearing in Chapter 10, Title 28, V.A.C.S.

It was decided, particularly, some 18 years before the enactment of Art. 1109a, V.A. C.S., the basic statutory provision under which San Antonio acquired its water works system.

In the case of City of Snyder v. Bass, 360 S.W.2d 426 (Tex.Civ.App., Eastland, 1962, wr. ref. n. r. e.) it appeared that Bass, a developer, brought suit against the city after the area in question had been annexed by it: (1) To recover the value of street pavement and sewer lines placed in a subdivision while it was outside the city limits, and (2) for mandatory injunction to require the city to extend certain water lines within the subdivision, and to have the court hold void an ordinance of the city. The trial court rendered judgment in favor of Bass for $14,329.00 representing the value of the paving and sewer lines as found by the jury, but denied the mandatory injunction sought by Bass. Both parties appealed. The Court of Civil Appeals reversed as to the trial court recovery by Bass and rendered judgment in favor of the city that Bass take nothing. The Court affirmed the judgment "insofar as it refused injunctive relief requiring the City of Snyder to extend its water lines in the manner sought by Bass." The city ordinance mentioned in the first paragraph of the opinion was never identified nor discussed by the Court. Most of the opinion is concerned with that phase of the case involving the claim of Bass for recovery of the value of street pavement and sewer lines installed before the area was annexed and is not material to the other phase of the case involving extensions of mains to other lots owned by Bass. Bass testified that he originally plotted the subdivision into 43 lots, 19 of which had been sold, that he had 24 lots left and also two blocks which could be platted into 9 more lots. Concerning the second phase of the case, the court said:

"The trial court refused to order the City to extend its water lines to the unserved lots. Bass has appealed from this portion of the judgment and contends that the City has a mandatory duty to extend

water lines within the subdivision under the provisions of Section 9 of the Home Rule Charter of the City of Snyder which provides as follows:

'By annexing the territory under the provisions of this section, the City of Snyder shall assume an obligation, and from the time of such annexation shall be obligated, to furnish the facilities of the City, including, but not limited to, water, sewer and street maintenance to the inhabitants of such territory with reasonable diligence, both as to time and as to the extent of such facilities furnished.'

"The court properly refused to require the City to extend the water line now existing in the Bassridge Addition, although the city has the responsibility to furnish water to the inhabitants of the City. This service is subject to reasonable regulations promulgated by the City. The Charter does not require the City to furnish all extensions of water mains desired by a property owner, but only to furnish such facilities with reasonable diligence. In the case of Crouch v. City of McKinney, 47 Tex.Civ.App. 54, 104 S. W. 518, the obligation of a city to furnish utility service and extend lines therefor was discussed by the court and it was therein stated that the government of a City is entrusted to its officials selected for that purpose and so long as such governmental affairs are conducted in a reasonably judicial manner, the acts of the officials will not be interfered with. It was indicated concerning the duty of a city to extend water lines that the matter should be left to the sound discretion of the City Council. This matter is also discussed in 48 A.L.R.2d 1224, where it is stated that the majority rule is that a city in such cases has the right to exercise its discretion in a reasonable manner. Also see Gillam v. City of Fort Worth, Tex. Civ.App., 287 S.W.2d 494, (Ref.N.R.E.)."

It is apparent that Bass sought relief on the basis of that provision of the City Charter relating to annexed territory. Bass

claimed that the city had a "mandatory duty" to make the requested extensions of water mains to his unsold lots. In rejecting that contention the Court of Civil Appeals made the above-quoted holdings. I have examined the original record and briefs filed in City of Snyder v. Bass, supra. It is apparent from such examination that the contention of Bass was solely based upon the City Charter and the passage of time. He made no showing concerning the reasonableness of his request for extensions and no issue was submitted to the jury related to that phase of the case.

In the case of Johnson v. Benbrook Water & Sewer Authority, 410 S.W.2d 644 (Tex.Civ.App., Ft. Worth, 1966, wr. ref. n. r. e.) the first three findings of the trial court, as set out in the opinion, were as follows:

"1. The Defendant, Benbrook Sewer and Water Authority, was created as a governmental agency and a body politic and corporate under and by virtue of Article 8280–163 of Vernon's Annotated Civil Statutes of Texas, which Article was an act passed by the 54th Legislature of this State in 1955.

"2. The Defendant obtains its authority and powers to operate under Article XVI, Section 59 of the Texas Constitution, (Vernon's Ann.St.) and from the above mentioned Article creating said Defendant, and it possesses all of the rights, power and privileges conferred by the General Laws of this State applicable to water control and improvement districts created under the above mentioned Article and Section of The Texas Constitution.

"3. At the time of its creation, the Defendant's boundaries were identical with those of the village of Benbrook, Tarrant County, Texas."

Conclusions of law Nos. 1 and 8 of the trial court read as follows:

"1. The Defendant was authorized under the statutes creating Benbrook Water & Sewer Authority, the general law pertaining to water control and improvement districts and under the Constitution of the State of Texas to adopt the rules and regulations herein complained of by Plaintiff."

\*    \*    \*    \*    \*    \*

"8. The Defendant's action herein complained of by Plaintiff does not amount to an abuse of discretion on the part of said Defendant."

Johnson v. Benbrook is distinguishable from the instant case. There the court was dealing with a special governmental agency created by a specific statute under Art. XVI, Section 59 of the Texas Constitution. That class of agency is clearly different from a home rule city owning and operating its water works in a proprietary or business function. See Willacy County Water Control and Improvement District No. 1 v. Abendroth, 142 Tex. 320, 177 S.W.2d 936 (1944), wherein our Supreme Court held as follows:

"Section 59a of Article XVI of the Constitution authorized the creation of Water Control and Improvement Districts. After providing that the Legislature shall pass all such laws as may be appropriate for the conservation and development of all the natural resources of this State, and particularly describing the details of what may be done, it contains the following language: '(b) There may be created within the State of Texas, or the State may be divided into, such number of conservation and State may be divided into, such number of conservation and reclamation districts as may be determined to be essential to the accomplishment of the purposes of this amendment to the constitution, which districts shall be governmental agencies and bodies politic and corporate with such powers of government and with the authority to exercise such rights, privilege and functions concerning the subject matter of this amendment as may be conferred by law.' "

\*    \*    \*    \*    \*    \*

"Irrigation districts, navigation districts, levee and improvement districts, and like political subdivisions created under Section 59a of Article XVI of the Constitution, and statutes enacted thereunder carrying out the purposes of such constitutional provisions, are not classed with municipal corporations, but are held to be political subdivisions of the State, performing governmental functions, and standing upon the same footing as counties and other political subdivisions established by law."

In Bexar-Medina-Atascosa Counties Water Improvement District No. 1 v. State, 21 S.W.2d 747 (Tex.Civ.App., San Antonio, 1929, wr. refused) the court pointed out that a water sewer district organized Art. XVI, Sec. 59 of the Texas Constitution is not an ordinary corporation organized for purposes of gain to its members, but is a public agency, a political corporation or division of the state which has principally for its object the administration of the government, or to which the powers of government, or a part of such powers, have been delegated.

Benbrook Water and Sewer Authority was created under Art. 8280–163, V.A.C.S., enacted in 1955, as a conservation and reclamation district. That statute was amended by addition in 1965 to provide in substance that the City of Benbrook, by taking the appropriate steps, could purchase the property and assume the liabilities of the authority (district), after an election was held and the qualified voters of the district approved such sale to the City, and the City would then discharge the services and functions of the district. The change in operation from the authority to the city was not involved in *Johnson*, and the same may or may not have been accomplished at a later date. However, it is clear that in *Johnson* the operation of a water utility was not then by a city, but on the other hand was by the special governmental agency created as above-stated. It also does not appear that there was any showing as to reasonableness of the requested extension in that case.

In my view, *Johnson* holds that because of the constitutional and statutory provisions under which it was created and operating, Benbrook Water & Sewer Authority properly adopted the policy which required a developer to bear the entire cost of water and sewer extensions into a new area, and such policy did not take the developers' property without due process or deny equal protection. But it must be noted that the issue of reasonableness of the request for extension was apparently not there involved.

*Johnson* is not authority for the position that a home rule city, operating under the conditions shown to exist here can adopt the same policy as the authority (district) there.

I do not believe that the holdings in *Crouch, Bass* and *Johnson* actually support appellees' position concerning discretion. It appears to me that entirely too much reliance has been placed on language of the opinions rather than the material holdings of those cases.

The case of Kimbrough v. Walling, 371 S.W.2d 691 (Tex.Sup.Ct., 1963), is cited in the majority opinion in connection with the power of a city to provide a water supply and the discretion therein involved. I do not believe that the case is in point or helpful on the issues involved here. In *Kimbrough* the question related to the power of a general law city to retain and pay attorneys to represent it in a law suit in which the city opposed the efforts of the North Central Texas Municipal Authority (created under art. 8290–193, V.A.C.S., pursuant to Art. XVI, Section 59 of the Constitution) to construct a particular dam and reservoir as a source of municipal water supply for the city of Haskell. The Supreme Court affirmed the judgment of the Court of Civil Appeals which reversed the judgment of the trial court granting a permanent injunction against the officials of the city from expending funds in the prosecution of an appeal suit from an order of the State Board of Water Engineers issuing an appropriation permit to North

Central Texas Municipal Authority. The language of the opinion in *Kimbrough* was in that context. That case did not involve the question of payment for extensions of mains by a city-owned water utility or its customers, nor regulations of the type here in question.

In my view, the statutes and cases relied on by appellees are not sufficient to support their position that the regulations here can be sustained on the basis of proper exercise of discretion by the agent of the City, its Water Board. As I see the matter, the authorization given by the City Council, which was pro forma in nature, does not add anything to what was done by the Board. Under the Statutes, particularly Art. 1109a, V.A.C.S., and the 1957 City ordinance, the Board, not the City Council, has management and control of the water works system and the power to prescribe regulations.

I believe that a proprietary function is here involved in connection with extension of "on-site" mains. Neither adequate or efficient water service can be furnished without them. In my view, in the light of the foregoing discussion, the agents of the city-owned water utility do not have the discretion to refuse an extension in its monopoly area which is reasonable in fact, whether the function exercised is proprietary or governmental.

## VI.

## THE DISCRIMINATION QUESTIONS; CLASSIFICATION OF DEVELOPERS

Appellant, primarily by its points 7–12, attacks the various conclusions of law made by the trial court (particularly conclusions 19, 26, 27, 28 and 29) relating to the questions of discrimination.

Appellant's position here is that the regulations result in unjust and unreasonable discrimination against developers, including appellant and new customers; that the regulations in effect violate the common law rule against unreasonable discrimina-

tion, and amount to hostile or special legislation directed against developers; and that the equal protection clauses of the State and Federal constitutions are thus violated. The discussion of these questions overlap.

Our Supreme Court in City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622 (1952) has reiterated the common law rule that one engaged in rendering a utility service (including a municipally-owned utility) may not discriminate in charges or service between persons similarly situated and that there is a duty to treat all alike unless there is a substantial basis for the differentiation.

I agree with appellant that the policy adopted by the Board which deliberately shifts part of the cost of making new extensions to developers and new customers without compensation and hope of reimbursement results in unreasonable discrimination and cannot be sustained as a valid classification.

The discrimination which results from the regulations is in favor of the old customer on old mains installed prior to the 1960 regulations and new customers (including developers) on new mains installed after the regulations. The new customer, although similarly situated is required to bear an additional burden—payment of capital cost of an "on-site" main—which the old customer did not have to bear.

The record reflects that the net revenue to be expected from a new customer, (based upon experience for a period of almost five years of operation under the regulations) is sufficient to amortize a capital investment of $448.00 over a period of 30 years. Appellees' utility expert so testified. Using appellees' figures of $326.00 per lot as the average present day cost of "back-up facilities," it is apparent that net revenues from new customers will produce an additional amount ($122.00 in the example) which will be available for other purposes including the servicing of bond issues. The 1956 bond issue of $20,885,000.00 will not be paid out until the year 1989. New customers since February 23, 1960, by paying

the same rate for water service as old customers, contribute to payment of such bonded indebtedness. New customers, therefore, are thus required to pay for expenditures made for the benefit of old customers, including "on-site" mains, installed before the regulations in question. Under the regulations, old customers are not required to pay for the new customers' "on-site" mains, but new customers, at least in part, are required to bear the expense of old customers' "on-site" mains and the improvements made to the system from bond issues prior to 1960. In my view, unreasonable discrimination between persons similarly situated is present here.

Appellees' exhibit 14 sets out the proposed capital improvements program of the Water Board for 1964–1968. That program calls for expenditures of $635,000.00 for storage and production facilities and $5,365,000.00 for distribution projects. On page 6 of said exhibit there is a statement concerning the alternative methods of financing this five year program and whether current users or new customers will be benefitted. As to the last-mentioned matter, the following statement is made.

"The third factor to be considered is whether the construction program is primarily for the benefit of current users or is designed to extend and improve the system for new customers. While certain of the projects will provide capacity for extension of the system, the majority of the costs are associated with projects to increase circulation and reliability of service to existing customers. Consequently, current customers will, for the most part, obtain the benefits from the program."

It thus appears that new customers are again required to contribute to expenditures made for the benefit of old customers in connection with the capital improvements program.

The basic rules relating to classifications for purposes of legislation are summarized in 12 Tex.Jur.2d, Constitutional Law, Sections 110–114, pages 457–462. In part, such rules require that the classification be not arbitrary or unreasonable; that it must be based upon real and substantial differences having a natural, reasonable and substantial relation to the subject of the legislation; that it must affect alike all persons or things within a particular class, or similarly situated; and there must be an actual classification, not special legislation under the name of classification. Some of the cases I have reviewed on the questions of discrimination and classification are as follows: Housing Authority of City of Dallas v. Higginbotham, 135 Tex. 158, 143 S.W.2d 79, 130 A.L.R. 1053 (1944); State v. City of Austin, 160 Tex. 348, 331 S.W.2d 737 (1960); Commercial Ins. Co. of Newark v. Adams, 366 S.W.2d 801 (Tex.Civ.App., Houston, 1963), writ refused 369 S.W.2d 927 (Tex.Sup.1963); Sitterle v. Victoria Cold Storage Co., 33 S.W.2d 546 (Tex.Civ. App., San Antonio, 1930, wr. dism.).

Appellant concedes the rule of legislative classification but contends that it is not dispositive of the issues in this case and that the regulations in question cannot stand as a valid classification. Appellant says, in substance, that under the regulations the developer is in effect set up as a "strawman" for the purpose of improperly exacting contributions of capital for water main extensions.

Appellees argue that a developer is not the ultimate customer, and there is no assurance of revenue from sales of water; that, if the Board is required to bear all costs of water main extensions that the city would in effect be required to take a stake in a speculative venture with appellant and other developers; and that classification may be sustained on such basis. Appellant says in effect that such argument is based upon a misconception of its position concerning reasonableness of a request for extension of water mains and the discretion which may properly be exercised. Appellant concedes that the Water Board has the right to exercise discretion in connection with a proprietary function as to whether a particular requested extension is

reasonable in fact; and that the Board has the alternative, in a proper case, of returning to the revenue-refund system, where the developer makes the initial capital outlay and takes all the risk of loss.

On this phase of the case, appellant relies in part on City of Nederland v. Callihan, 299 S.W.2d 380 (Tex.Civ.App., Beaumont, 1957, wr. ref. n. r. e.), wherein the Court approved a revenue-refund arrangement.

The Court held in part as follows:

"* * * The City of Nederland here had the lawful authority to purchase the water and sewer lines from Callihan in the manner in which this record shows was followed by both parties. The agreement to reimburse Callihan could not under any circumstance become a charge against the tax funds of the City of Nederland, and payments to him could be made only in the event that houses were built in the West Side Addition and that the occupants bought water and used the sewer line taken over by the City and paid revenue to the City for such services. The City had full authority to agree to pay Callihan for his water and sewer systems by paying him one-half of what money they should receive, if any, from the use of his water and sewer lines by residents of the West Side Addition. The City in this way made a good bargain. It paid out no money except for the supervision of the laying of the lines and in return therefor it received and is still receiving revenue from users of the water and sewer lines. Callihan on the other hand might gain or might lose under this contract at the time it was made. If he was not successful in selling his lots in the addition, and getting people to build houses thereon and make use of the water and sewer lines and pay for such use to the City of Nederland, then he would receive no reimbursement for his investment.

"We are unable to see any delegation of authority by the City Council to Callihan of the City's right to install water and sewer lines, as is contended for by the appellant. The agreement with Callihan, as we view it, did not constitute a delegation of any authority to him by the City. It was simply a non-expense method, adopted by the City of Nederland, by which it acquired in addition to its water and sewer lines, by agreement to pay for such addition only out of the proceeds to be received in the future for the use of said lines so acquired."

Appellees' contention that because the Board may not be required to bear the cost of all extensions of mains requested by a developer or new customer, that it thus has the power by the regulations to impose conditions for furnishing of service which require developers and new customers to fully and finally bear the cost of "on-site" mains and donate them to the city-owned water utility, is in effect the argument that the greater power includes the lesser one. Such argument was rejected in City of Texarkana v. Wiggins, 151 Tex. 100, 246 S.W.2d 622 (1952). There the court held in part as follows:

"* * * But assuming that petitioner has no duty to serve, it does not follow, under the common-law rule at least, that having elected to serve it may do so on such terms as it chooses to impose. The contention that the petitioner, being under no legal obligation to serve, may do so on such terms as it chooses to impose brings before us a familiar argument in a new guise. It is the old, and logically appealing, argument that the greater includes the lesser power, that a governmental unit having the greater power of granting or withholding a privilege or service it perforce must have the lessor power of offering the privilege or service on whatever terms it may impose. * * *"

"* * * we therefore reiterate; assuming that the petitioner is under no legal duty to serve it by no means follows that, having elected to serve, it may do so on a discriminatory basis. We do not mean to imply by citation of this au-

thority that the ordinance is unconstitutional. As to this we express no opinion. These cases do illustrate, however, that the greater does not always include the lesser power and we think it important that this be understood for it has been the source of what we conceive to be error in the decision, in other jurisdictions, of the question before us."

I believe that the case of Elizabethtown Water Company Consolidated v. Board of Public Utility Commissioners, Department of Public Utilities, State of New Jersey, et al., 27 N.J. 192, 142 A.2d 85 (Sup.Ct.N.J., 1958) throws considerable light on many of the questions here involved, including discrimination, classification, duty of the utility in connection with extensions, reasonableness, the factors of reasonableness, discretion, and revenue-refund arrangements. In that case the Supreme Court of New Jersey affirmed (by a vote of 5–2) an order of the Board of Public Utility Commissioners requiring appellant Elizabethtown Water Company to extend its facilities to supply water to the respondent Board of Fire Commissioners of Fire District No. 3, Township of Piscataway, and to certain residents of the area involved. The General Rules of the New Jersey Public Utilities Commissioners concerning extensions were there involved, but I believe that the discussion in both the majority and dissenting opinions, particularly of the cases therein cited, is helpful in connection with decision of the instant case.

I believe that classification of developers in connection with water main extensions could justify a difference in treatment of them on the questions of initial capital outlay for extensions and the method of reimbursement for same; but I am unwilling to hold that such classification can justify the full and final imposition of costs of "on-site" mains without compensation and promise of reimbursement on some reasonable basis. There may well be fact situations in which a city-owned water utility does not have a duty to make an extension of mains initially at its whole cost, and may

properly decline to do so. However, the power to refuse to make the initial capital outlay does not authorize the city-owned utility to acquire cost-free extensions by imposing the whole cost on the developer or new customer. In my view, such action constitutes unreasonable discrimination under the common law rules recognized by our Supreme Court as applicable to city-owned water utilities as well as privately-owned utilities, and denies the equal protection of the law guaranteed by both the State and Federal Constitutions.

## VII.

## DUE PROCESS
## EQUAL PROTECTION

I agree with appellant that the requirement of the regulations that under all conditions a developer or new customer must unconditionally donate to appellees the capital expenditure for extensions of "on-site" mains amounts to a denial of due process of law and of equal protection of the law under both the State and Federal Constitutions.

The money necessary to make the capital expenditure for new "on-site" mains originally belongs to developers or new customers. Their property in that form is converted into mains which are laid in the ground. The regulations require that title to such mains be transferred to the City and its Water Board of Trustees without compensation or promise of reimbursement. The regulations refuse to recognize that any request for extension of an "on-site" main can be reasonable in fact or can be made reasonable in the light of experience. The purpose of the regulations is to fully and finally shift the capital cost of all new "on-site" mains to developers and new customers. In my view, such action constitutes a taking of property without due process of law.

Under the regulations, where an extension is reasonable in fact, the city-owned utility takes property from the developer or new customer in lieu of making the

capital expenditure which it is its legal duty to make. In the case of a request for extension which may not be reasonable in fact when made, the city-owned water utility takes the property of developers or new customers to the extent that a particular extension may be proved reasonable after installation. The taking is complete because of the provisions of the regulations which require before water service is furnished that a developer fully and finally bear the cost of "on-site" mains and convey the same to the City and its Water Board, without any provision for determining whether a particular request for extension is reasonable in fact. In my view, the regulations, therefore, deprive appellant and developers of their property without due process of law. They also deny equal protection of the law for the reasons stated in Sec. VI herein, relating to the discrimination questions. Constitution of Texas, Article 1, Sections 3, 17 and 19; Constitution of the United States of America, Amendment 14, Section 1. Missouri K. T. R. Co. v. Rockwall County Levee Improvement Dist. No. 3, 117 Tex. 34, 297 S.W. 206 (1927); Ex Parte Baker, 127 Tex.Cr.App. 589, 78 S.W.2d 610 (1935); Harvey v. Morgan, 272 S.W.2d 621 (Tex. Civ.App., 1954, wr. ref. n. r. e.). See, also Town of West University Place v. Anderson, 60 S.W.2d 528 (Tex.Civ.App., Galveston, 1933, n. w. h.); Derby Heights, Inc. v. Gantt Water & Sewer District, 237 S.C. 144, 116 S.E.2d 13 (1960); Styers v. City of Gastonia, 252 N.C. 572, 114 S.E.2d 348 (1960); Leonard v. Town of Waynesboro, 169 Va. 376, 193 S.E. 503 (Sup.Ct.App.Va., 1937); Wichita Finance & Thrift Company v. Lawton, 131 F.Supp. 788 (U.S.D.C., W. D.Okla., 1955).

## VIII.

### DECLARATORY JUDGMENT

The declaratory judgment questions will now be discussed. For the reasons heretofore stated, in my view, the trial court erred in holding that appellant Crownhill should take nothing by its suit and that the regulations in question are lawful, reasonable and enforceable. On the record here presented this Court is in position to render the declaratory judgment which the trial court should have rendered. See Cobb v. Harrington, 144 Tex. 360, 190 S.W.2d 709, 172 A.L.R. 837 (1945).

In my view, declaratory judgment should be here rendered as follows: that the regulations in question are invalid insofar as they impose upon appellant the cost of extending "on-site" water mains without compensation or promise of reimbursement; that appellees have the legal duty to make and pay for extensions of water mains which are reasonable in fact within the city limits of San Antonio; that appellant and other developers may be classified and treated differently based upon real and substantial differences in fact and upon consideration of the proper factors of reasonableness; but that a classification which imposes on them fully and finally the costs of "on-site" mains unreasonably discriminates, denies equal protection and takes property without due process of law; that where a request for extension of mains may not be reasonable in fact at the time it is made, when tested by the proper factors of reasonableness, the Board may require the developer to furnish the original capital outlay; but the cost of same may not be fully and finally imposed upon the developer, and the Board must furnish a basis to compensate or reimburse the developer or new customer for the required capital outlay to the extent that the extension made proves to be reasonable in fact; that one such reasonable basis for compensation or reimbursement to the developer or new customer furnishing the initial capital outlay is the revenue-refund arrangement, one form of which is still in effect as to "approach mains" in this case; that the Water Board of Trustees may adopt regulations which contain criteria of reasonableness to which developers may look for guidance in presenting requests for extensions; but, whether such regulations are adopted or not the Board must consider

each request for extension in the light of its reasonableness and determine the same on the merits; that the decision of the Board is subject to judicial review upon appropriate complaint by an aggrieved applicant.

## IX.

## MANDAMUS

I believe that the holdings which should be made and the declaratory judgment which should be rendered would largely determine the questions concerning mandamus. The error of the trial court in holding that the regulations were lawful and reasonable resulted in denial of any relief to appellant, including declaratory judgment favorable to appellant as well as writ of mandamus. It is apparent that the trial court did not actually determine on its individual merits the claim of appellant that its specific request for extension was reasonable in fact. Instead, the trial court relied upon its holdings that the regulations were reasonable and valid in imposing upon appellant and other developers the cost of "on-site" mains. The record herein does not include sufficient or appropriate findings or conclusions concerning the merits of appellant's specifically requested extension, nor correct findings or conclusions as to mandamus.

Since, in my view, the trial court was in error in upholding the regulations in the respects mentioned, that portion of the case concerning the ancillary relief by writ of mandamus sought by appellants should be severed and the judgment in such respect reversed and remanded to the trial court with instructions. The trial court should be instructed to proceed to hear and determine appellant's application for writ of mandamus in connection with the specifically requested extensions of on-site mains to the three lots hereinabove described in Crownhill Unit #8, in accordance with the declaratory judgment to which appellant is entitled; and that it should disregard the invalid provisions of the regulations which fully and finally impose the capital costs

of such extensions on appellant. It is well settled that the writ of mandamus may issue in a proper case to compel a city to furnish water or connections. City of Galveston v. Kenner, 111 Tex. 484, 240 S.W. 894 (1922); City of Nacogodoches v. McBride, 27 S.W.2d 866 (Tex.Civ.App., Beaumont, 1930, n. w. h.); 37 Tex.Jur.2d, Mandamus, Section 34, p. 647. The judgment of the trial court concerning mandamus would be, of course, subject to the usual review.

## X.

## CONCLUSION

Some of the cases from other jurisdictions cited in the majority opinion support appellant's contentions concerning reasonableness of the request for an extension of water mains or revenue-refund arrangements. See, e. g., Commonwealth ex rel. Green v. Alexandria Water Co., 192 Va. 512, 65 S.E.2d 521 (1951); Wolff v. Louisville Water Co., Inc., 302 S.W.2d 104 (Ct. App., Ky.1957); Johnson v. Reasor, 392 S.W.2d 54 (Ct.App., Ky.1965). A reading and analysis of the remaining cases will reflect that none of them is in point in support of the regulations here in question. Even if such cases did support appellees' position, I believe that they would be contrary to the Texas Statutes and cases herein discussed.

I would reverse the judgment of the trial court and here render declaratory judgment in favor of appellant as hereinabove set out. I would also reverse the judgment concerning appellant's application for mandamus and remand that phase of the case with instructions.

## APPENDIX A

The amended findings of fact and conclusions of law made by the trial court.

## "FINDINGS OF FACT

"1. Plaintiff is a Texas Corporation which engages in the business of developing new, primarily residential subdivisions for profit. 2. Defendant appoints the members of a statutory municipal board, called Water Works Board of Trustees, which operates,

manages and controls the water works system owned by Defendant City of San Antonio.

3. On February 18, 1960, the City Council of the City of San Antonio authorized and approved 'Regulations for Water System Extension and Service Line Installation' which were adopted by said Water Works Board of Trustees. Said Regulations were amended on March 12, 1962, and said amendments were adopted by said Board. (See Plaintiff's Exhibit No. 8).

4. Said Regulations were authorized and approved by action of the City Council of the City of San Antonio and were adopted by said Board pursuant to and based upon a complete study made by said Board of the extension needs and requirements of the water works system and of the financial ability of the system and the community to support extension of water service.

5. Said Regulations were adopted pursuant to and in accordance with the City's duly and legally enacted Master Plan for extension of water service.

6. Said Regulations announced defendant's new policy with respect to financing the extension of 'on-site' mains and appurtenances (e. g. fire hydrants) for new subdivisions, as the term 'on-site' is defined therein. Prior to February 1956 such extensions were installed by developers who were reimbursed out of defendant's revenues from supply of water service to the lots served by such extension up to 100% of installation cost. After February 1956 the same revenue refund procedure was employed; however, the maximum potential refund was limited to 50% of installation cost. The current Regulations (Plaintiff's Exhibit No. 8) eliminate such refunds entirely.

7. Said Regulations do not contain criteria for granting exceptions to defendant's policy nor do they confer the right to a hearing, public or otherwise, to developers affected thereby.

8. Plaintiff, on January 24, 1964, filed this suit for declaratory judgment (and certain ancillary relief not here pertinent) contesting the validity of defendant's Regulations on the theory that they infringe plaintiff's constitutional rights. Following numerous hearings on dilatory pleas and plaintiff's motion for Summary Judgment, plaintiff, on August 13, 1964, applied to defendant's Board seeking the installation, at the Board's whole cost and expense of necessary mains and appurtenances to serve plaintiff's subdivision known as Crownhill Park, Unit 8, lying wholly within the city limits of San Antonio. Defendant's Board granted and held a public hearing on said application December 15, 1964, at which hearing plaintiff appeared by its officers and counsel, and offered such evidence as it desired to submit.

9. Plaintiff's application for main installation does not comply with the Board's Regulations governing extension of water service.

10. After due consideration, said Board on April 13, 1965, denied Plaintiff's application.

11. All lots in said Crown Hill Park, Unit 8, except three presently have a water main adjacent to them. Such mains were installed at various times in the past under contracts between plaintiff and the Board or the Board and other developers whose subdivisions tie into a portion of said main. Cost of installation of such existing mains was borne partially by the Board and partially by plaintiff.

12. All of Plaintiff's 37 lots in Crown Hill Park, Unit 8, including the three lots without an adjacent main, presently have water service available to them upon plaintiff's compliance with the duly and legally adopted Regulations and said Board has paid all the costs of extending water service to new subdivisions and to said lots except the cost of 'on-site mains of local benefit' only and appurtenances thereto.

13. 'On-site local benefit mains' are those mains from which a lot directly receives a water supply and are of benefit only to the lots within the subdivision served by such mains.

14. The cost of extension of water service to any lot includes the cost of 'back-up facilities' defined as wells, pumps, pump houses, chlorinating equipment, reservoirs, tanks, transmission mains, telemetering and control equipment and appurtenances as well as 'on-site local benefit' mains.

15. The cost of on-site 'local benefit mains' is only a part of the whole cost of the extenison of water service to any lot.

16. Existing Regulations permit Plaintiff to develop any area with all of the cost of water service being borne by said Board except the cost of 'on-site local benefit' mains.

17. The anticipated revenue from all of the lots in Crown Hill Park, Unit 8, will be insufficient ever to amortize the cost of extending water service to said lots.

18. Anticipated revenues from Lots 67, 68 and 69 of Crown Hill Park, Unit 8, presently without adjacent 'on-site local benefit mains' will be insufficient ever to amortize the cost of extending water service to said lots. (This conclusion was corrected by stipulation to reflect that the correct lot numbers are 37, 38 & 39.)

19. The extension of water service, at said Board's whole cost, to the three lots in question would require that the entire expense of extension, other than the 'on-site local benefit' mains and appurtenances, be amortized by revenue from existing customers.

20. Defendant's practice has been and is, by virtue of its subdivision control authority, to prevent the issuance of building permits for lots within subdivisions until and unless the developer thereof complies with the Regulations in controversy.

21. Crownhill Park, of which plaintiff's Unit 8 is an increment, has been a successful residential development since its inception in 1959.

22. The cost of the installation of mains and appurtenances requested by plaintiff plus the Board's cost in existing mains within the Unit can be amortized out of the revenues to be derived by the Board from serving the thirty-nine (39) lots therein.

23. Defendant's ultimate customer is the purchaser of a lot in plaintiff's subdivision; however, plaintiff or its home builder assignee require interim service during the course of home construction.

24. Plaintiff attempts to recover the development cost of 'on-site' mains and appurtenances by charging such costs directly to the purchaser of the lot receiving water service. Assuming all other market factors to be stable, and allowing for inflation, the cost of a lot in Crownhill Park Unit 8 will exceed that of lots in those Units of the same subdivision developed under the Board's pre-existing 50% refund policy by the proportionate amount of such refund which has been discontinued under present policy.

25. Those of defendant's customers securing service under the policy prevailing prior to February 1956 did not have to bear a share of the cost of extending the mains and appurtenances to which their service lines were connected. Those securing service under February 1956—February 1960 policy bore only a part of such cost.

26. Defendant's Board has already committed its total revenue presently available for extensions pursuant to and in accordance with a general or master plan, which plan does not provide for or authorize expenditures for 'on-site' mains and appurtenances.

27. Said Board has adopted a complete Capital Improvement Program, pursuant to and in accordance with said General Plan and said Regulations, for the extension of water service to all areas of the municipality, including new subdivisions, by which Improvement Program the Board pays a majority of the cost of extension of water service except the cost of 'on-site' mains and appurtenances.

28. · Said Board has issued and has outstanding approximately 20 million dollars of revenue bonds and has pledged all its revenues to the payment of said bonds with the exception of certain revenues exempted by statute from the bondholders' irrevocable first lien.

29. Absent a rate increase, the issuance of additional revenue bonds, or both, said Board has no funds, not otherwise reserved by statute for the satisfaction of the bondholders' irrevocable first lien, available for expenditure for 'on-site' main and appurtenance installation.

30. The Regulations in question were adopted after such revenues had been pledged to secure an irrevocable first lien held by said bondholders.

31. The Regulations were adopted pursuant to and in accordance with a rate ordinance which set a rate to pay for operation, maintenance, depreciation, replacement, betterment, and interest and principal charges only. The Defendant's City Council specially excluded from its consideration in setting said rate any charge for the purpose of raising sufficient revenues to pay for 'on-site' mains and appurtenances.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties to and the subject matter of this suit.

2. Plaintiff has a justiciable interest.

3. A 'justiciable controversy' appropriate for determination under the Declaratory Judgments Act is here presented.

4. Plaintiff has exhausted its administrative remedies if any it had.

5. Defendant, in owning and operating through its Board of Trustees the municipal water supply system for the City of San Antonio, acts in a proprietary capacity, but in fixing rates and prescribing rules and regulations for operation of such system, it acts in a legislative and governmental capacity.

6. Defendant has the legal duty to provide equal and uniform service at equal and uniform rates and charges to all situated within the city limits of the City of San Antonio and desiring such service, subject to reasonable rules and regulations not infringing constitutional guarantees.

7. The Water Works Board of Trustees of the City of San Antonio is an agency of the City of San Antonio authorized by statute and ordinance to manage and control the water works system of the City of San Antonio and said Board has been delegated legislative and governmental powers for such purpose. Article 1109a, Section 4, V.A.T.S., City of San Antonio Ordinance No. 24819, Sec. 27(a).

8. Except with respect to fixing rates and charges for service, said Board of Trustees has full power and authority, absent constitutional infringement, with reference to: control, management and operation of the system; the expenditure and application of revenues; the making of rules and regulations governing the furnishing of water service; and has full authority with reference to making extensions to the extent authorized by law. Article 1109a, Section 4, V.A.T.S., City of San Antonio Ordinance No. 24819, Sec. 27(a).

9. In connection with the management and operation of the system and the expenditures and application of revenues therefrom, the Board is vested with all the powers of the city with respect thereto, with the exception of fixing rates and charges for service. Article 24819, Sec. 27(a) (sixth paragraph).

10. The City has the exclusive right to operate a water works system, to regulate the same and has power to prescribe rates for water furnished and to do and perform whatsoever may be necessary to operate and maintain the system. Article 1175, V.A.T.S.

11. The City has the power and right to own and operate water systems and to regulate and control them in a manner to protect the interests of the city. Article 1108, Section 2, V.A.T.S.

12. The City has the power and the right to prescribe the kind of water mains within or beyond the limits of the city and to make such rules and regulations and prescribe penalties concerning the same as shall be necessary and proper. Article 1108, Section 4, V.A.T.S.

13. The City has the power and the right to promulgate general rules and regulations

and to adopt a general plan for the extension of water mains. Article 974a, V.A.T.S.

14. The right to determine the area to be served and extensions to be made by a water utility is a matter within the sound discretion of the governing body. Article 1116, V.A.T.S.

15. The determination of how much of the revenues of the water system should be applied to the extension of the system is within the sound discretion of the governing body. City of San Antonio Ordinance No. 24819, Sec. 27(a) (sixth paragraph), Articles 1113, 1113a, V.A.T.S.

16. The bondholders have an irrevocable first lien on all revenues of the water system except for revenues used for certain expenditures exempted from said lien by statute, and expenditures for extensions are not exempted from the bondholders' prior lien except those which in the Board's judgment are necessary to keep the plant in operation and render adequate service.

17. The Board in the exercise of its reasonable judgment and sound discretion has duly and legally adopted a program for extensions which does not include expenditures for 'on-site local benefit mains.'

18. The Regulations in question have the legal effect of an ordinance and both the reasonableness and validity thereof are presumed.

19. The Regulations in question are reasonable, lawful and a legal exercise of legislative discretion and governmental power.

20. The Regulations and order in question have a reasonable basis in fact and are justified by the Findings of Fact, even though there may be other reasonable approaches or methods to finance the cost of 'on-site local benefit' main installations.

21. Plaintiff failed to meet its burden of proof that the Regulations or order in question are arbitrary and capricious.

22. The Board is not required by law to maintain *ad infinitum* the same regulations governing the extension of water service, but may adopt from time to time such regulations which it is empowered to enact, which are reasonable and do not infringe the Constitution.

23. The Regulations in question and the Board order of April 13, 1965, are reasonably supported by substantial evidence.

24. Plaintiff was not denied procedural or substantive due process under the Texas or United States Constitution in the hearing before said Board or by the order of April 13, 1965, for reason that the order of which complaint is made was merely an enforcement or implementation of the Regulations in issue which the Court has found to be reasonable, valid and supported by substantial evidence. The Regulations establish clearly defined standards which apprise Plaintiff of its rights, duties and obligations thereunder.

25. Plaintiff failed to discharge its burden to prove that the operation and effect of the Regulations in question confiscated its property without just compensation.

26. The Regulations and order in question afford full and equal protection of the law to Plaintiff.

27. Developers of subdivisions constitute a separate and distinct class for utility regulatory purposes as evidenced in the Findings of Fact, and Plaintiff receives equal and uniform treatment with other members of the same class.

28. The Regulations in question are not discriminatory in their operation and effect.

29. To require the Board to extend water service at its whole cost would unduly discriminate against existing customers.

30. Plaintiff failed to show sufficient grounds to entitle it to Writ of Mandamus.

31. The determination of what area will be served and where water mains will be extended is not a mere ministerial function but is an exercise of discretion and Writ of Mandamus will not lie to require the governing body of the municipality to do so, absent Constitutional infringement.

32. Plaintiff has failed to discharge its burden to prove that said Regulations and order infringe the State or Federal Constitutions.

# FINANCIAL AND STATISTICAL INFORMATION

## APPENDIX B

| OPERATING RESULTS | 1964 | 1963 | 1962 | 1961 | 1960 | 1959 | 1958 | 1957 | 1956 | 1955 | 1954 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue and Other Income * | $ 7,022,656 | $ 7,782,993 | $ 7,287,770 | $ 5,992,920 | $ 5,051,126 | $ 5,030,271 | $ 4,687,671 | $ 4,723,104 | $ 5,426,438 | $ 3,957,233 | $ 3,833,550 |
| Operating Expenses | 2,851,611 | 2,916,476 | 2,777,069 | 2,720,234 | 2,783,691 | 2,744,949 | 2,716,236 | 2,512,575 | 2,461,200 | 2,033,552 | 1,780,481 |
| Depreciation and Amortization | 1,393,805 | 1,309,439 | 1,240,997 | 1,163,177 | 1,090,588 | 940,363 | 743,402 | 707,505 | 649,990 | 580,540 | 524,833 |
| Interest on Bonded Debt | 792,487 | 808,803 | 808,129 | 733,165 | 716,949 | 699,473 | 638,188 | 378,317 | 171,490 | 185,277 | 198,348 |
| Redemption of Bonds and Bond Reserve Additions | 521,831 | 513,094 | 489,697 | 469,044 | 420,855 | 446,115 | 415,238 | 386,989 | 255,000 | 242,000 | 229,000 |
| Revenue Available For Plant Additions | $ 1,462,922 | $ 2,235,181 | $ 1,971,878 | $ 907,300 | $ 39,043 | $ 199,371 | $ 174,607 | $ 737,718 | $ 1,888,758 | $ 915,864 | $ 1,100,888 |
| Revenue Per 1,000 Gallons Pumped — Cents | 23.7 | 23.9 | 23.6 | 22.1 | 18.8 | 18.9 | 18.5 | 18.9 | 18.4 | 15.2 | 14.9 |
| Operating Expense Per 1,000 Gallons Pumped — Cents | 9.6 | 9.0 | 9.0 | 10.0 | 10.4 | 10.3 | 10.7 | 10.0 | 8.3 | 7.8 | 6.9 |
| **FINANCIAL DATA** | | | | | | | | | | | |
| Gross Plant Additions | $ 4,996,017 | $ 4,554,048 | $ 4,350,702 | $ 2,485,809 | $ 4,093,047 | $ 5,037,676 | $ 8,762,707 | $ 3,924,303 | $ 1,676,573 | $ 2,720,661 | $ 2,686,903 |
| Total Utility Plant | 63,534,640 | 59,230,517 | 55,140,023 | 51,436,982 | 50,218,695 | 46,622,299 | 41,999,127 | 33,496,606 | 29,572,303 | 27,895,729 | 25,175,068 |
| Accumulated Depreciation | 14,145,130 | 13,279,767 | 12,278,250 | 11,503,260 | 11,411,740 | 10,719,859 | 10,069,667 | 9,524,410 | 8,861,511 | 8,234,622 | 7,702,003 |
| Inventory | 311,353 | 382,953 | 355,970 | 452,484 | 458,504 | 636,257 | 748,625 | 1,009,243 | 725,253 | 648,341 | 492,500 |
| Bonded Debt | 21,218,000 | 21,517,000 | 21,809,000 | 20,115,000 | 18,380,000 | 18,607,000 | 15,860,000 | 16,098,000 | 3,033,000 | 3,288,000 | 3,530,000 |
| Municipal Equity (Including Reserves) | 34,815,490 | 32,013,349 | 28,495,101 | 25,395,667 | 23,245,511 | 21,852,841 | 20,547,283 | 19,141,237 | 17,579,770 | 15,681,211 | 13,890,064 |
| Total Revenue Less Operating Expenses | 4,171,045 | 4,866,517 | 4,510,701 | 3,272,686 | 2,267,435 | 2,285,322 | 1,971,435 | 2,210,529 | 2,965,238 | 1,923,681 | 2,053,069 |
| Average Annual Debt Requirements | $ 1,208,741 | $ 1,204,843 | $ 1,200,074 | $ 1,088,311 | $ 1,178,182 | $ 1,168,896 | $ 1,160,572 | $ 966,953 | $ 436,299 | $ 436,254 | $ 436,244 |
| Times Debt Coverage | 3.45 | 4.04 | 3.76 | 3.01 | 1.92 | 1.96 | 1.70 | 2.29 | 6.80 | 4.41 | 4.71 |
| **OTHER STATISTICS** | | | | | | | | | | | |
| Water Pumped — Million Gallons | 29,631 | 32,549 | 30,930 | 27,098 | 26,861 | 26,558 | 25,332 | 25,010 | 29,472 | 25,983 | 25,723 |
| Metered Usage — Million Gallons | 25,577 | 28,861 | 26,690 | 22,555 | 22,262 | 22,525 | 20,873 | 21,491 | 25,183 | 21,122 | 20,744 |
| Annual Rainfall — Inches | 31.88 | 18.65 | 23.90 | 26.46 | 29.76 | 24.50 | 39.69 | 48.83 | 14.31 | 18.18 | 13.70 |
| Customers at End of Year | 135,728 | 132,181 | 129,301 | 127,190 | 124,962 | 123,816 | 119,800 | 113,421 | 112,042 | 109,224 | 103,996 |
| Average Use Per Customer — Thousands of Gallons | 188.4 | 220.7 | 206.4 | 177.3 | 178.2 | 181.9 | 174.3 | 189.4 | 224.7 | 193.3 | 199.4 |
| Average Revenue Per Customer | $ 51.74 | $ 58.88 | $ 56.36 | $ 47.12 | $ 40.42 | $ 40.63 | $ 39.13 | $ 41.64 | $ 48.43 | $ 36.23 | $ 36.86 |
| Miles of Main Installed | 95.76 | 66.91 | 60.69 | 63.02 | 48.86 | 87.45 | 140.45 | 29.70 | 40.99 | 66.37 | 63.66 |
| Miles of Main Replaced and Abandoned | 52.88 | 18.83 | 27.46 | 26.26 | 9.20 | 21.64 | 29.62 | 10.13 | 5.65 | 3.53 | 3.84 |
| Miles of Main In Place | 1,760.95 | 1,718.07 | 1,669.99 | 1,636.76 | 1,600.00 | 1,560.34 | 1,494.53 | 1,383.70 | 1,364.13 | 1,328.79 | 1,265.95 |
| New Services Installed | 3,192 | 3,237 | 3,189 | 2,815 | 3,131 | 4,783 | 6,703 | 2,886 | 3,322 | 5,810 | 5,816 |
| Fire Hydrants Installed | 508 | 307 | 316 | 316 | 189 | 347 | 341 | 96 | 112 | 215 | 146 |
| Fire Hydrants In Place | 6,563 | 6,279 | 6,046 | 5,888 | 5,720 | 5,540 | 5,227 | 4,886 | 4,781 | 4,672 | 4,413 |
| Number of Employees | 532 | 536 | 542 | 553 | 604 | 628 | 662 | 657 | 585 | 511 | 437 |
| Total Salaries and Wages Paid | $ 2,220,369 | $ 2,124,314 | $ 2,024,613 | $ 2,045,006 | $ 2,101,298 | $ 2,133,209 | $ 2,198,921 | $ 1,950,830 | $ 1,744,847 | $ 1,396,258 | $ 1,188,842 |
| * Excludes Metered Sales to City of San Antonio Which Amount To | $ 197,129 | $ 189,119 | $ 190,472 | $ 155,619 | $ 130,009 | $ 127,891 | $ 127,956 | $ 84,387 | .........Not Accounted For......... | | |